NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

BLEVINS POPCORN COMPANY,
Respondent,

American Federation of Grain
Millers, Intervenor.

No. 75–1748.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 30, 1981.

Decided July 10, 1981.

Bernard Jeweler, Atty., N. L. R. B., Washington, D. C., with whom Elliott Moore, Deputy Associate Gen. Counsel, Paul Elkind, Asst. Gen. Counsel, and Peter Ames Eveleth, Deputy Asst. Gen. Counsel, National Labor Relations Board, Washington, D. C., were on the brief, for petitioner.

Richard A. Brackhahn, Memphis, Tenn., for respondent.

Charles Orlove, Chicago, Ill., entered an appearance for intervenor.

Before WRIGHT, TAMM, and WALD, Circuit Judges.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

Opinion concurring in the result filed by Circuit Judge TAMM.

J. SKELLY WRIGHT, Circuit Judge:

In this appeal the National Labor Relations Board (NLRB) seeks review of a determination by a Special Master that the Blevins Popcorn Company (the company) did not violate a contempt and purgation order issued by this court on September 16, 1977. In that order we stated that the company would face sanctions if it did not begin bargaining in good faith with the American Federation of Grain Millers, AFL–CIO (the union), which represented employees at the company's Ridgway, Illinois facility.[1] As we explain below, we conclude that the Special Master imposed an unduly heavy burden of proof on the NLRB. We also conclude that the Master may not have applied the proper legal principles in determining whether the company bargained in good faith. Thus we remand to the Master for new findings of fact and conclusions of law.

## I. BACKGROUND

A. *Enforcement Order and First Contempt Proceeding*

On May 4, 1977 this court entered a judgment enforcing in full a decision and order of the NLRB issued against the company on June 19, 1975. *See Blevins Popcorn Co.*, 218 NLRB 689 (1975). In its decision the NLRB found that the company had unjustifiably refused to bargain with the union over rates of pay, wages, hours, and other terms and conditions of employment. The order, as enforced, directed the company to:

1. Cease and desist from:

(a) Refusing to bargain collectively concerning rates of pay, wages, hours, and other terms and conditions of employment with American Federation of Grain Millers, AFL–CIO, as the exclusive bargaining representative of its employees in the following appropriate unit:

All production and maintenance employees, including truckdrivers employed at the Employer's facility in Ridgeway [*sic*], Illinois, but excluding office clerical employees, professional employees, guards and supervisors as defined in the Act.

(b) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them in Section 7 of the Act.

2. Take the following affirmative action which the Board finds will effectuate the policies of the Act:

(a) Upon request, bargain with the above-named labor organization as the exclusive representative of all employees in the aforesaid appropriate unit with respect to rates of pay, wages, hours, and other terms and conditions of employment, and, if an understanding is reached, embody such understanding in a signed agreement.

218 NLRB at 691.[2]

On September 16, 1977, upon motion of the NLRB, this court entered a second order summarily adjudging the company in civil contempt for willfully continuing to fail and refuse to comply with the court's May 4 order.[3] The September 16 order stated that the company could purge itself of civil contempt by:

(a) Fully complying with and obeying this court's judgment of May 4, 1977 by, upon request, bargaining collectively in good faith with the union as the exclusive representative of [the company's] employees in the appropriate unit, and, if an understanding is reached, embodying such understanding in a signed agreement, provided, however, that such agreement may be made subject to termination should the United States Supreme Court ultimately decide that [the company] was not obligated to recognize and bargain with the union.

---

**1.** *See* Special Master's Findings of Fact and Conclusions of Law, *reprinted at* Appendix (A) 1, 2. The company, a wholly owned subsidiary of the Conwood Corporation, is engaged in production and sale of packaged popcorn. It operates three facilities in the South and the Midwest. *Id.* at 4.

**2.** *See also id.* at 1.

**3.** *See id.* at 2.

(b) Proceeding with the officials of the union to set an initial meeting date, not to exceed ten days from entry of this order, and thereafter proceeding to bargain upon consecutive days during regular business hours until all contract proposals on mandatory and lawful subjects have been considered and actions taken in relation thereto.

The order further provided:

3. That in order to assure against further violations of this court's judgment, this court assesses against [the company] a prospective fine in the amount of one hundred dollars ($100.00) per day if compliance with this order has not been commenced within seven (7) days of the date of this order.

On further motion by the Board the court will take such other and further action and grant such other relief as appears just, reasonable, and necessary at that time.

*See* Special Master's Findings of Fact and Conclusions of Law, *reprinted at* Appendix (A) 1, 2.

B. *Events From September 1977 to June 1978*

Upon issuance of the court's contempt and purgation order, the company's attorney, Richard Brackhahn, sought to arrange a bargaining session with the union within ten days.[4] Because the union was unable to meet within that time, the parties agreed to begin negotiations on September 30, 1977. The parties later agreed that, at least initially, they would not meet on consecutive days as provided by the order.[5]

At the September 30 meeting the union presented a six-page contract proposal covering a variety of economic and noneconomic matters. Several of these matters were discussed. The parties first considered the union's proposal that departmental seniority based upon an employee's continuous length of service govern layoffs and recalls,

---

4. Brackhahn represented the company throughout the NLRB and court proceedings, and participated in the negotiations with the union. The company was also represented by John Jolly, its Sales and Production coordinator. Both Jolly and Brackhahn conferred with the Ridgway plant manager, Charles McGuire, in developing the company's bargaining position. The union was represented primarily by Elmer Ferris, a staff representative of the American Federation of Grain Millers. *Id.* at 4.

Except where otherwise noted, our description of the events that took place between September 1977 and December 1978, described in Parts I–B and I–C of this opinion, are based on the Master's findings of fact. Because we remand so that the Master may reconsider the evidence in light of the proper standard of proof, some of these findings may change. As the discussion in Part II *infra* should reveal, our decision in this case does not turn on any of these findings of fact; we remand because we believe the Master misapplied the law.

Our description of the events that took place between September 1977 and December 1978, contained in Parts I–B and I–C of this opinion, is based primarily on the Master's findings of fact. In several instances we also refer to evidence that was not discussed in the Master's report; each of these instances is noted. The concurring opinion criticizes our description, complaining that we have embarked "upon a lengthy voyage of factfinding unjustified by anything other than philosophical predilection." Concurring opinion (conc'g op.) at 1190.

It proceeds to argue that we have acted in apparent disregard of the rule that a Special Master's findings of fact may be set aside only if "clearly erroneous." *Oil, Chemical & Atomic Wkrs Int'l Union v. NLRB*, 547 F.2d 575, 580 (D.C.Cir.1976), *cert. denied*, 431 U.S. 966, 97 S.Ct. 2923, 53 L.Ed.2d 1062 (1977). *See* conc'g op. at 1191. The concurrence misreads our opinion. We do not at this time purport to review the Master's findings of fact, which we concede could ordinarily be overturned only if clearly erroneous. Nor do we intend to engage in independent factfinding. Instead, as we explain *infra*, we simply point out that the Special Master committed several errors of law. The most important of these errors was his decision to impose a more rigorous burden of proof on the NLRB than was justified. Clearly, this error may have had an impact on his findings of fact. Under the circumstances, we do not believe that it is inappropriate to refer to evidence not specifically described in the Master's report. Of course, our description of the case is in no way binding on the Special Master, who must reconsider his original findings of fact, on remand, in light of the proper burden of proof.

5. More specifically, they agreed not to meet on consecutive days so that the company would have an opportunity to study the union's first contract proposal, and so that the company and the union could exchange information on several matters that would be the subject of bargaining. *Id.* at 5.

and that plantwide seniority based upon length of service determine "bumping rights."[6] The company stated that it would prefer a seniority system based upon the ability of the employees. The parties also discussed the union's proposal that the contract include a grievance procedure culminating in binding arbitration, and that it contain a no strike/no lockout clause. The company stated that it had no objection to the principle of binding arbitration. Finally, although the union's proposal was silent on this issue, the parties discussed the length of the contract. The company proposed a three-year term; the union did not object.[7]

Further negotiating sessions were held on October 10 and 11, 1977. The union made a wage proposal, asking for across-the-board increases for all employees of 35 cents per hour in the first and second years, and 30 cents in the third year. The company rejected this proposal, claiming that it would place the company in a noncompetitive situation and might lead to a cutback in operations at the Ridgway facility. At the close of the negotiating session the company requested a break of four to five weeks so that it could prepare a counterproposal. The union agreed to the delay.[8] There is some evidence suggesting that the company had already prepared a proposal, and that its request for a postponement was not made in good faith.[9]

The next negotiating session was held on November 17, 1977. The company presented a full counterproposal, the terms of which were quite disadvantageous to the union. The proposal included (1) a management rights clause reserving to the company all "inherent rights" except those specifically contracted away[10]; (2) three-year wage increases for current workers by name rather than job classification[11]; (3) a clause giving the company the right unilaterally to grant pay at higher rates to current or newly-hired employees; (4) a clause reserving to the company the right to set wage rates for new or changed jobs; (5) 54 rules by which employees could be disciplined; (6) a no strike/no lockout clause with individual union officer liability in the event of illegal union activities; and (7) a clause stating that for purposes of layoff and recall seniority would be determined by the company on the basis of an employee's physical and mental fitness, ability to do the job, and experience and continued length of service. Despite the company's earlier statement that it had no objection to the principle of binding arbitration, its proposal also called for a grievance procedure culminating only in nonbinding arbitration.[12]

After receiving the company's counterproposal, the union drew up a second proposal that bridged some of the gaps between the company and union positions. This proposal adopted much of the language

---

6. *Id.* at 6. A "bumping right" is the right of an employee whose department has been shut down to take the job of a less senior employee in another department.

7. *Id.* at 6–7.

8. *Id.* at 8.

9. The document presented to the union on November 17 contained proposals very similar to those set forth in another document introduced as evidence at the hearings before the Special Master. The latter document contained language stating that the company's proposals were subject to "automatic termination" in the event of Supreme Court action favorable to the company. *See* NLRB Exhibit (BX) 58 at 1. The Supreme Court denied the company's petition for a writ of *certiorari* to review the May 4, 1977 contempt adjudication on October 3, 1977.

Thus it would seem that a counterproposal had been prepared before October 3.

10. *See* Special Master's Findings of Fact and Conclusions of Law at A 8.

11. These offers ranged from a high of 15 cents per hour in the first year, 25 cents in the second year, and 20 cents in the third year for some employees, to a low of 10 cents in the first two years and 5 cents in the third year for others. *See* BX 24 at Appendix A. The individuals who were to receive the highest raises were all then earning the legal minimum wage, and the proposed increases were equal to the projected increases in the legal minimum. *See id.*; Transcript (Tr.) 83.

12. *See* Special Master's Findings of Fact and Conclusions of Law at A 8 (describing company counterproposal).

of the counterproposal, and made significant concessions. In particular, on the question of seniority the union proposed that plantwide seniority based on length of service be used for layoffs and recalls, but that employees retained or recalled must also have the qualifications necessary to perform the work in question.[13] The union further stated that it would agree to allow the company to use temporary employees for as long as 90 days without the accrual of any seniority rights.[14]

The union's second proposal and the company's counterproposal were discussed at meetings held on November 29 and 30, 1977. Although seniority, grievance procedures, union security, management rights, use of temporary employees, and distribution of overtime were discussed at length, no agreement was reached on these matters. Agreement was reached on several minor issues, such as posting of seniority lists.[15] At the November 30 meeting company attorney Brackhahn stated that he would like to postpone further negotiations until January because of illness in his family. The union stated that it would accept this delay.[16]

Although no meetings were held during December, several significant events occurred. First, the company decided to withhold an annual pay increase that it had given to its Ridgway employees during previous Decembers. The company justified this action on the ground that pay raises were barred while negotiations were in progress. When employees asked the plant manager, Charles McGuire, why they had not received raises, he told them that wages were "frozen" as a result of the union negotiations.[17] He further stated that "if the Union was not here [at the Ridgway plant] there would be a raise as normal, as the Company has always given them." [18]

The second event involved a letter sent by company attorney Brackhahn to plant manager McGuire, informing him of the status of the negotiations.[19] In this letter Brackhahn indicated that the company had adopted a rigid negotiating position. He stated that "no agreement has been reached on employees' wages" or on "employee insurance or hospitalization protection," because the union's position "remained economically unsound" and the company negotiators were "not about to agree to [the union's] position on these and many other issues discussed." [20] The letter further stated that the union's request for two 15-minute break periods was "ridiculous," that union membership would never be a condition of employment at the plant, and that the company would insist that all 54 work rules contained in its counterproposal be included in any contract.[21] McGuire passed the letter on to his supervisors, some of whom permitted the employees to read the letter. In addition, a handwritten version of the letter, copied by one of the employees, was circulated.[22]

A dispute later arose regarding the contents of this letter. Attorney Brackhahn

---

13. *Id.* at 9. Further concessions were made with respect to shift differentials, paid vacations, and probationary periods.

14. *Id.* The company's freedom to use temporary employees was an important issue, since operations at the Ridgway facility were seasonal in nature. *See id.* at 20.

15. Agreement was also reached on shift differentials and the circumstances under which seniority would be considered to be broken. *Id.* at 9.

16. *Id.* at 10.

17. *Id.*

18. *Id.* Prior to December Brackhahn had informed the union representative by letter that the company would not make any wage increases "that the law prohibits." BX 30.

19. McGuire became concerned that Brackhahn and the other company representatives had made substantial concessions at the bargaining table. Brackhahn wrote the letter to reassure McGuire about the status of negotiations. *See* Special Master's Findings of Fact and Conclusions of Law at A 10–11 n.6.

20. *Id.*

21. *Id.*; BX 50 (copy of letter).

22. Special Master's Findings of Fact and Conclusions of Law at A 10–11 n.6. Distribution appears to have been encouraged by Brackhahn. *The letter contains this sentence: "I am*

submitted to the NLRB a copy of the letter which differed in several material respects from the handwritten version. Brackhahn's copy suggested that the company's opposition to union demands was not rigid, and in general cast the company's bargaining position in a more favorable light.[23] It now appears that the copy submitted to the NLRB by Brackhahn was a fabrication and that the handwritten version is accurate.[24]

Two more bargaining sessions were held in early January 1978, but little progress was made. At those meetings the company said that it would be unable to meet during February because one of its negotiators would be away on a business trip.[25] Additional sessions were scheduled for January 16, 17, 23, and 24. Because of a snowstorm, however, the first two meetings were cancelled. At the sessions on January 23 and 24 the union continued its efforts to find common ground. It offered a third contract proposal which incorporated the minor agreements that had been reached at prior meetings, and which made significant concessions in the area of management rights, wages, holidays, and paid vacations. With respect to wages, the union sought a first-year increase that would equalize wages for employees in five job classifications, and across-the-board increases of 20 and 25 cents per hour in the second and third years of the contract.[26] The company rejected this proposal, stating that the wage increase was still too high. The company further stated that it was dissatisfied with the union's proposed grievance procedure. The company did agree to several minor proposals, such as a clause setting the time for distribution of paychecks.[27] No other significant agreement was reached, however. The company continued to insist that the union accept the major provisions of its November 1977 counterproposal.[28]

At both the January 23rd and January 24th meetings the union stated that it would like to meet throughout the week. The union also suggested that the company find a substitute for the representative who would be away during February, so that negotiations could continue through that month. The company rejected both suggestions and stated that it would not meet again until March. The union felt that the company was taking advantage of its acquiescence in previous delays, and threatened to complain to the NLRB and to terminate negotiations. Although negotiations were not terminated, the union did subsequently complain to the NLRB.[29]

On March 10, before the next negotiating session was held, a few employees who were

hopeful that you will assure these employees who have come to you and asked about what is going on in the meetings, that they have been deceived." BX 50 at 2.

**23.** *Compare* BX 50 *with* BX 48. For example, the Brackhahn version omits the sentence suggesting that McGuire should share the contents of the letter with employees, *see* note 22 *supra.*

**24.** The Master never explicitly found that the Brackhahn version was a fabrication. He stated only that the handwritten version "differs in material respects from the original letter claimed to have been written by Brackhahn to McGuire * * *." Special Master's Findings of Fact and Conclusions of Law at A 11 n.6. However, in describing the contents of the letter the Master quoted from the handwritten version. *Compare id. with* BX 50. This strongly suggests that he believed the handwritten version was accurate.

**25.** Company representative Jolly stated that he had to go on an important business trip during February. Special Master's Findings of Fact and Conclusions of Law at A 11. Jolly did not actually depart until February 7; he returned on February 24. Tr. 852–859. After his return neither he nor Brackhahn contacted the union until after receiving a letter from the union representative, dated March 2, requesting that arrangements be made for the next meeting. A 1; *id.* at 14; BX 34; Tr. 1014–1015. *See also* note 29 *infra.*

**26.** Special Master's Findings of Fact and Conclusions of Law at A 12.

**27.** The company also agreed to the union's proposed "recognition" clause, its "no-discrimination" clause, and a clause providing that the union would be notified when employees were given disciplinary warning slips. *Id.* at 12.

**28.** *Id.* at 12–13.

**29.** *Id.* at 13–14. When the union representative threatened to terminate negotiations, Brackhahn told him to "sleep on it." *Id.* This comment suggests that the company did not take

disaffected with the union asked plant manager McGuire if they could call a plantwide meeting to discuss withdrawing support from the union.[30] McGuire allowed a meeting to take place on paid company time, even though this was in contravention of past practice and in violation of the work rules contained in the company's 1977 counterproposal.[31] The meeting, which lasted about 30 minutes, failed to produce a vote to oust the union.[32]

Bargaining sessions were held on March 16th and 17th. The company stated that its Ridgway facility was in "bad shape" economically.[33] Seniority, wages, holidays, and paid vacations were discussed, but no progress was made. The union asked for consecutive-day bargaining, but the company refused, claiming that such meetings were unnecessary. It stated that it would meet again on April 5, 6, and 7, at which time it would present a final proposal to the union. The union agreed.[34]

At the April 5th meeting the union and the company agreed on the number of holidays, on insurance and hospitalization plans, and on a pension plan. At the April 6th meeting the company presented a proposed seniority list, which ranked all current employees according to ability, experience, and length of service. This seniority proposal was tied to a new wage proposal, which was slightly better than the company's first offer of November 1977.[35] The union responded on April 7th by presenting a new wage proposal of its own. This proposal, which demanded less than the January proposal, called for increases on the basis of employee job classifications in the first year; small across-the-board increases would be made in the second and third years.[36] The company conceded that the union had "come a long way," but rejected the proposal.[37] It further stated that if agreement could not be reached on wages, it would not discuss any other union proposals. After a long discussion, the company claimed that it had nothing further to offer and wanted to adjourn for two weeks. The union demanded that the company make a final offer on wages at that time.[38]

The next meetings were held on April 19th and 20th. A Federal Mediator attended at the union's request. At the April 20th meeting the union suggested a system of "classification" seniority. Under this sys-

the union's threats seriously. The Master found, however, that the company relied on the union representative's remarks about terminating negotiations. According to the Master, this explains why no · further arrangements for meetings were made, see note 25 supra, until after the union requested a resumption of contract negotiations in a letter dated March 2, 1978. Id. at 14.

30. These employees were apparently upset because they had not received their December raises. See BX 49 at 236–247.

31. See id.; Tr. 1106–1114, 725–729. McGuire also ordered his supervisors to watch the plant gates so that no company or union representatives could enter the plant while the meeting was in progress. BX 49 at 236–247; Tr. 1106–1114, 725–729. Plant supervisor McGuire claims he was unaware of the purpose of the meeting. Tr. 1076–1077.

32. Special Master's Findings of Fact and Conclusions of Law at A 14.

33. Id.

34. Id. at 14–15.

35. A new vacation proposal was also tied to the seniority proposal. This vacation proposal offered less than the November 1977 vacation proposal. BX 24 at 13–14; BX 30; Tr. 1033–1038.

In his report the Master found that during the April 5th and 6th negotiation sessions the company "tried to break the impasse over seniority by offering to 'buy off' the seniority issue, i.e., offer more money for wages and have the Union give in on the seniority hiring date position." Special Master's Findings of Fact and Conclusions of Law at A 15. He further found that "the Union refused to talk about it * * *." Id. The NLRB now disputes this finding. It argues that the "buy off" overture was actually a reference to the new seniority-wage-vacation proposal. Thus the union did not unreasonably refuse to consider a compromise. See NLRB brief at 28 n.35.

36. Special Master's Findings of Fact and Conclusions of Law at A 15.

37. See Tr. 202–204; BX 16.

38. Special Master's Findings of Fact and Conclusions of Law at A 15.

tem layoff and recall would be determined on the basis of tenure within a designated job classification. Bumping rights would be based on plantwide hire dates and ability to perform the work. No agreement was reached.[39]

Because the Mediator was unavailable, no sessions were held during May.[40] The parties met again with the Mediator on June 19th, 20th, 21st, and 22nd. The company offered a slight change in its position on seniority. It drew up a new seniority list which grouped all present employees into separate departments and provided for department layoff and recall in accordance with the previous managerial ranking of employees. The union stated that it would accept this system if the company would agree to base bumping rights upon the employees' hire dates and ability to perform the work.[41] The company refused, stating that it would not accept any seniority system that did not allow for unilateral ranking of the employees by management.[42] After several days of discussion devoted almost solely to the seniority issue, the Mediator declared an impasse.[43] The union wished to continue meeting, but the company withdrew, claiming that seniority was the key to resolution of all other major issues.[44]

### C. Events From June 1978 to December 1978

The union continued to request further meetings, but the company stated that it

would not meet again unless the union would agree to its position on seniority.[45] In late September 1978 the company withdrew recognition from the union on the ground that it had a good faith doubt as to the union's majority status. This claim was based upon a petition signed by a majority of the Ridgway employees to the effect that they no longer wanted the union to represent them.[46]

In early October 1978 the company granted a wage increase averaging 20 cents per hour to the employees of the Ridgway facility. This wage adjustment was intended in part to compensate employees for the company's failure to grant a wage increase in December 1977. The average raise exceeded the highest amount offered by the company[47] to the union during negotiations. Two of the employees who were responsible for circulating the anti-union petition were given the largest wage increases.[48] Additional raises ranging from five to six percent were granted in December 1978 in accordance with the company's established practice.[49]

### D. Second Contempt Proceeding

On September 22, 1978, two days before it withdrew recognition from the union, the company asked this court to dissolve the September 16, 1977 contempt and purgation order on the ground that negotiations had

**39.** At these meetings the negotiators agreed that the major unresolved issues were seniority and wages. *Id.* at 16.

**40.** *Id.*

**41.** The union also submitted a list showing each employee's qualifications to perform various plant jobs, so that their bumping rights would be clear. *Id.* at 17.

**42.** *Id.* at 16–17.

**43.** *Id.* at 17. As the Special Master seems to have recognized, *see id.* at 22, the Mediator's declaration that the parties were deadlocked is not controlling on the question whether there was a *bona fide* impasse that terminated the parties' duty to continue negotiations. That question is partly legal in nature; the Media-

tor's finding was simply evidence that such an impasse existed. *See* note 55 *infra* (discussing *bona fide* impasse issue).

**44.** Special Master's Findings of Fact and Conclusions of Law at A 17.

**45.** *Id.*

**46.** *Id.* at 17–18.

**47.** *Id.* at 18.

**48.** *See* Tr. 1027–1032, 1082, 1112; BX 54; Respondent's Exhibit (RX) 19.

**49.** Special Master's Findings of Fact and Conclusions of Law at A 18.

reached a *bona fide* impasse.[50] The NLRB responded to this motion by filing an opposition statement and by moving for another civil contempt adjudication. In its motion the NLRB claimed that the company had violated the September 16, 1977 contempt and purgation order by failing to bargain with the union in good faith and by failing to meet with the union at reasonable intervals during the period September 30, 1977 through June 22, 1978. It further alleged that the company had violated the court's order by refusing to meet with the union after June 22, 1978 and by withdrawing recognition from the union. It asked this court to assess fines and to increase prospective fines.[51]

■■■ In March 1979 this court appointed a Special Master to hear evidence and make recommended findings of fact and conclusions of law with respect to the company and NLRB motions. The Master conducted several hearings in September 1979.[52] He issued his report on December 16, 1980.[53] The Master found that the company had bargained in good faith throughout the period September 16, 1977 to June 22, 1978. He rejected the NLRB's claim that the company had attempted to undermine the union by (1) repeatedly delaying negotiations; (2) withholding the annual wage increase; (3) allowing employees to read the letter from Brackhahn to McGuire; and (4) permitting the anti-union meeting to be held on paid company time.[54] The Master also found that a *bona fide* impasse existed as of June 22, 1978, and that the company therefore properly refused to continue bargaining with the union.[55] Finally, he found that upon receiving the anti-union petition the company had reasonable grounds to doubt the union's majority status and properly withdrew recognition.[56]

**50.** *Id.* at 3.

**51.** *Id.*

**52.** *Id.* at 3–4. Hearings were held on September 17–21 and September 26, 1979.

**53.** *Id.* at 1.

**54.** *Id.* at 19–22.

**55.** *Id.* at 22. When parties have bargained in good faith but have reached impasse on all mandatory issues, the obligation to continue bargaining ends. *See, e.g., NLRB v. Big Three Industries, Inc.*, 497 F.2d 43, 48 (5th Cir. 1974); *see also NLRB v. Tomco Communications, Inc.*, 567 F.2d 871, 881 (9th Cir. 1978). The NLRB offered two arguments in support of its claim that there was no *bona fide* impasse. First, it claimed that the company had not bargained in good faith, and that the courts will not recognize the existence of an impasse in the absence of good faith. Second, it argued that even if the company had bargained in good faith, there was no real impasse since there were many open issues at the time of the last meeting. The parties were deadlocked only because the company refused to meet again until the union accepted its position on seniority. *See* NLRB brief at 52–54.

The Master rejected these claims. As we have seen, he believed that the parties had bargained in good faith. Moreover, the parties were deadlocked. The Mediator had found that the parties negotiated to an impasse on the issues of seniority and wages. Moreover, "[s]ubsequent correspondence indicates that both the Company and the Union refused to budge on their respective positions." Special Master's Findings of Fact and Conclusions of Law at A 22. Thus the Master concluded that the company did not wrongfully refuse to continue bargaining with the union. He cited *NLRB v. Tomco Communications, Inc., supra*, 567 F.2d at 881, which holds that when "a single issue looms so large that a stalemate as to it may fairly be said to cripple the prospects of any agreement," the parties' duty to continue negotiation to impasse on all mandatory issues is suspended.

We have some doubts about the Master's conclusion that further bargaining would have been fruitless. Although the parties probably were deadlocked on the seniority and wages issues, it seems that they could have continued bargaining on a number of other issues, such as grievance procedures and arbitration. Negotiations terminated at least in part because of the company's intransigence. The Master should reconsider this issue in reviewing his findings of fact.

**56.** The NLRB attacked the company's decision to withdraw recognition, arguing that when a union's representative status is based on Board certification, as in this case, there is an irrebuttable presumption that the union's majority support continues for a reasonable period, usually a year. *See* NLRB brief at 52 (*citing NLRB v. Burns Security Services*, 406 U.S. 272, 279 n.3, 92 S.Ct. 1571, 1578 n.3, 32 L.Ed.2d 61 (1972)). The one-year certification period begins on the date the employer commences good faith bargaining. Here, claimed the NLRB, the

The Master concluded by recommending that the NLRB's motion for a further contempt order be denied and that the company's motion to dissolve the prior contempt order be granted.[57] The NLRB filed exceptions.

## II. DISCUSSION

### A. *The NLRB's Burden of Proof*

■ At the outset of the legal discussion contained in his report the Special Master stated that, to meet its burden of proof, the NLRB is "required to produce clear and convincing evidence in support of its allegations of contemptuous conduct * * *."[58] Despite this reference to the clear and convincing evidence standard, it appears that the Special Master actually imposed a far heavier burden of proof on the NLRB. Later in his report he suggested that the Board must prove its case beyond a reasonable doubt: he stated that, "if there is ground to doubt the wrongfulness of the conduct, the Company should not be held in contempt."[59] The Master also stated that "the proof must demonstrate that there existed a wilful and deliberate disregard of a court decree."[60] As we explain below, the Master applied the wrong standard of proof; the NLRB should not have been required to do more than produce clear and convincing evidence in support of its allegations.

■ As a general rule, the "reasonable doubt" standard of proof and the "willfulness" requirement are applicable only in criminal contempt proceedings.[61] In civil contempt proceedings the clear and convincing evidence standard applies[62] and the failure to comply with the court decree need not be intentional.[63] The explanation

company had not bargained in good faith. The Master rejected this argument. As we have seen, he concluded that the company did bargain in good faith for roughly one year after the bargaining order was issued. He went on to note that a disaffection petition signed by a majority of the employees is usually sufficient grounds to withdraw recognition. *See* Special Master's Findings of Fact and Conclusions of Law at A 23 (*citing NLRB v. Alterman Transport Lines, Inc.*, 587 F.2d 212, 228 (5th Cir. 1979)). Assuming the Master's good faith determination was correct, *see* Part II–B *supra*, we agree with his conclusion on this issue.

57. *See* Special Master's Findings of Fact and Conclusions of Law at A 24.

58. *Id.* at 19. *See also id.* at 3, 24 (other references to "clear and convincing" standard).

59. *Id.* at 19. The Master never expressly stated that he intended to apply the criminal standard of proof. Certainly, however, his report is ambiguous on this point. Because of this ambiguity, we cannot affirm his findings.

60. *Id.* (*citing NLRB v. Laney & Duke Storage Warehouse Co.*, 424 F.2d 109, 113 (5th Cir. 1970)).

61. *See In re Winn-Dixie Stores, Inc.*, 386 F.2d 309, 313 (5th Cir. 1967) (in a criminal contempt proceeding "proof must show a knowing, willful and intentional violation beyond a reasonable doubt"); *Green v. United States,* 356 U.S. 165, 78 S.Ct. 632, 2 L.Ed.2d 672 (1957) (applying reasonable doubt standard); *Michaelson v. United States*, 266 U.S. 42, 45 S.Ct. 18, 69 L.Ed.

162 (1924) (same); *United States v. Spectro Foods Corp.*, 544 F.2d 1175, 1183 (3d Cir. 1976) (reasonable doubt standard applies in criminal contempt proceedings); *see also Mullaney v. Wilbur*, 421 U.S. 684, 699–701, 95 S.Ct. 1881, 1889–1891, 44 L.Ed.2d 508 (1975); *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970).

62. *See, e.g., NLRB v. Alterman Transportation Lines, Inc.*, *supra* note 56, 587 F.2d at 221–222; *NLRB v. Decaturville Sportswear Co.*, 518 F.2d 788 (6th Cir.), *cert. denied*, 423 U.S. 913, 96 S.Ct. 217, 46 L.Ed.2d 141 (1975); *Stringfellow v. Haines*, 309 F.2d 910, 912 (2d Cir. 1962); *Telling v. Bellows-Claude Neon Co.*, 77 F.2d 584 (6th Cir.), *cert. denied*, 296 U.S. 594, 56 S.Ct. 108, 80 L.Ed. 420 (1935).

63. *See, e.g., McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949); *Oil, Chemical & Atomic Wrks. Int'l Union v. NLRB*, 547 F.2d 575, 581 (D.C.Cir.1976), *cert. denied*, 431 U.S. 966, 97 S.Ct. 2923, 53 L.Ed.2d 1062 (1977); *Screw Machine Tool Co. v. Slater Tool & Engineering Corp.*, 480 F.2d 1042, 1044 (6th Cir. 1973); *Hodgson v. A–1 Ambulance Service, Inc.*, 455 F.2d 372, 374 (8th Cir. 1972); *NLRB v. Fairview Hospital*, 443 F.2d 1217, 1220 (7th Cir. 1971); *NLRB v. Crown Laundry & Dry Cleaners, Inc.*, 437 F.2d 290, 293 (5th Cir. 1971); *NLRB v. Ralph Printing & Lithographing Co.*, 433 F.2d 1058, 1062 (8th Cir. 1970), *cert. denied*, 401 U.S. 925, 91 S.Ct. 883, 27 L.Ed.2d 829 (1971); *Doe v. General Hospital of D. C.*, 434 F.2d 427, 431 (D.C.Cir.1970). *See generally* 3

for this distinction lies in the different purposes of criminal and civil contempt. Criminal contempt is used to punish intentional misconduct.[64] Thus the procedural safeguards that attend any criminal proceeding, including the reasonable doubt standard of proof, come into play. In addition, the recalcitrant party's state of mind is a central issue. Civil contempt, on the other hand, is a remedial sanction used to obtain compliance with a court order or to compensate for damage sustained as a result of noncompliance.[65] Thus criminal procedure safeguards are not applicable.[66] Moreover, the intent of the recalcitrant party is irrelevant.[67]

The Master never disputed these general principles. He noted, however, that this is the third stage of a three-stage civil contempt proceeding.[68] Such proceedings involve (1) issuance of an order; (2) following

disobedience of that order, issuance of a conditional order finding the recalcitrant party in contempt and threatening to impose a specified penalty unless the recalcitrant party purges itself of contempt by complying with prescribed purgation conditions; and (3) exaction of the threatened penalty if the purgation conditions are not fulfilled.[69] The Master apparently conceded that the clear and convincing evidence standard should be applied at the second stage, and that no showing of willfulness would be necessary. He suggests, however, that the third stage is punitive in nature since a fine may be assessed.[70] Thus the wrongfulness of the recalcitrant party's conduct must be shown not just by clear and convincing evidence, but beyond any ground for doubt.[71] Moreover, the party's state of mind is crucial.[72]

C. Wright, Federal Practice and Procedure § 705 (1969); Moskovitz, *Contempt of Injunctions, Civil and Criminal,* 43 Colum.L.Rev. 780, 818–819 (1943); Comment, *Civil and Criminal Contempt in the Federal Courts,* 57 Yale L.J. 83 (1947).

**64.** *See, e.g., United States v. United Mine Workers of America,* 330 U.S. 258, 302, 67 S.Ct. 677, 700, 91 L.Ed. 884 (1947).

**65.** *See, e.g., Shillitani v. United States,* 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); *McComb v. Jacksonville Paper Co., supra* note 63; *McCrone v. United States,* 307 U.S. 61, 59 S.Ct. 685, 83 L.Ed. 1108 (1939); *United States v. Spectro Foods Corp., supra* note 61, 544 F.2d at 1183 (distinguishing civil and criminal contempt); *see generally* Comment, *The Coercive Function of Civil Contempt,* 33 U.Chi.L.Rev. 133 (1965).

**66.** *See, e.g., Brhd of Locomotive Firemen & Enginemen v. Bangor & Aroostook R. Co.,* 380 F.2d 570, 578–579 (D.C.Cir.), *cert. denied,* 389 U.S. 327, 88 S.Ct. 437, 19 L.Ed.2d 560 (1967); *Hoffman v. Beer Drivers & Salesmen's Local Union No. 888,* 536 F.2d 1268, 1273 (9th Cir. 1976).

**67.** *See, e.g., McComb v. Jacksonville Paper Co., supra* note 63, in which the Supreme Court stated:

Civil as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance. * * * Since the purpose is remedial, it matters not with what intent the defendant did the prohibited act. * * *

336 U.S. at 191, 69 S.Ct. at 499. (citations and footnote omitted).

**68.** *See* Special Master's Findings of Fact and Conclusions of Law at A 19 n.10. He stated:

This proceeding is in the third stage of civil contempt where the exaction of penalty is determined and wilfulness is required. It is not similar to the second stage of civil contempt where only a threat of penalty is made and wilfulness is not a requirement. *O. C. & Atomic Workers Int. Union, AFL–CIO v. N. L. R. B.*[,] 547 F.2d 575, 581 (D.C.Cir.1976), *cert. denied,* 431 U.S. 966 [97 S.Ct. 2923, 53 L.Ed.2d 1062] (1977).

As further support for his decision to impose a willfulness requirement the Special Master cited *NLRB v. Laney & Duke Storage Warehouse Co., supra* note 60, 424 F.2d at 113. *See* Special Master's Findings of Fact and Conclusions of Law at A 19.

**69.** *See Oil, Chemical & Atomic Wkrs. Int'l Union v. NLRB, supra* note 63, 547 F.2d at 581; O. Fiss, Injunctions 763–764 (1972) (discussing three-step contempt).

**70.** *See* note 68 *supra* (*quoting* Special Master).

**71.** The reasoning behind his decision to require the NLRB to prove the wrongfulness of the company's conduct *beyond any ground for doubt is actually somewhat unclear.* As we stated earlier, his report is ambiguous on this point; elsewhere he states that he is applying the clear and convincing evidence standard. *See text* and notes at notes 58–59 *supra.*

**72.** *See* note 68 *supra* (*quoting* Special Master).

These conclusions as to burden of proof are erroneous. The third stage of three-stage contempt proceedings does not lose its civil character simply because a penalty may be imposed. The third-stage proceeding is part of the process by which the court obtains compliance with its decrees; it supports the second-stage contempt and purgation order. At the second stage the recalcitrant party is put on notice that unless it obeys the court's decree and purges itself of contempt it will be fined or face other sanctions. At the third stage the court determines whether the party has fulfilled the purgation conditions. If it has, it escapes the threatened penalty; if it has not, the penalty is imposed.[73] To hold that the third-stage proceeding is punitive or criminal would be to hold that a court may never bring about compliance with its orders by imposing prospective penalties in civil proceedings.[74]

In fact, we have already rejected the claim that the third stage of three-stage contempt is criminal in nature. *Brhd of Locomotive Firemen & Enginemen v. Bangor & Aroostook R. Co.*, 380 F.2d 570 (D.C. Cir.), *cert. denied*, 389 U.S. 327, 88 S.Ct. 437, 19 L.Ed.2d 560 (1967).[75] Our reasoning in that decision turned on the relationship between the second- and third-stage proceedings:

> [T]he fine-imposing [*i.e.,* second-stage] proceeding, to coerce compliance, set a *future* performance date. A later assessment of the fines so imposed, upon a showing of non-compliance, is not sufficient to require the classification of such an assessment as separately punitive. * * Because a question of fact must be determined at this assessment [*i.e., third-stage*] proceeding (that of non-compliance by the specified performance date), the proceeding does not necessarily become a punitive, criminal action wherein the recalcitrant party must be afforded

**73.** Criminal contempt is often distinguished from civil contempt on the ground that it has as its principal purpose vindication of judicial authority. *See Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 441, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911). It might be argued that the third-stage proceeding is criminal, because the court is acting to vindicate its authority. But vindication of judicial authority is also present to some degree in civil proceedings. *See Juidice v. Vail*, 430 U.S. 327, 335–336 & n.12, 97 S.Ct. 1211, 1217 & n.12, 51 L.Ed.2d 376 (1977); *Shillitani v. United States, supra* note 65, 384 U.S. at 369–371, 86 S.Ct. at 1534–1536. "The civil nature of the contempt is not turned criminal by the court's efforts at vindicating its authority, an interest which may be implicated in either civil or criminal proceedings." *United States v. Wendy*, 575 F.2d 1025, 1029 n.13 (2d Cir. 1978); *see also United States v. Work Wear Corp.*, 602 F.2d 110 (6th Cir. 1979).

**74.** *See Hoffman v. Beer Drivers & Salesmen's Union Local No. 888, supra* note 66, 536 F.2d at 1273:

> [I]nevitably, wherever a compliance fine is assessed and an opportunity given to purge, the failure to purge will bring about a due date. The due date occurs because the actor has failed to use the key to the jail which the court provided. * * * The occurrence of the due date does not transform civil proceedings, whose sole aim is to secure compliance, into a criminal proceeding. Were it otherwise, compliance with laws or orders could never be brought about by fines in civil contempt proceedings. Always the final order requiring payment will follow the act or omission which constitutes the failure to purge.

**75.** As support for his decision the Master cites another case decided by this court, *Oil, Chemical & Atomic Wkrs. Int'l Union v. NLRB, supra* note 63, 547 F.2d at 581. *See* note 68 *supra.* In that case we were confronted with the question whether there was an intent requirement in a second-stage proceeding. After observing that we were not dealing with criminal contempt or with the last stage in three-stage contempt proceedings, we held that there was no intent requirement. We reasoned that the purpose of a motion for civil contempt, at least at this second stage, "is not to punish intentional misconduct, but rather to enforce compliance with an order of the court and to remedy any harm inflicted on one party by the other party's failure to comply." 547 F.2d at 581 (*quoting Doe v. General Hospital of D. C., supra* note 63, 434 F.2d at 431). The Master apparently believed that this holding implies that a different standard applies at this third stage. We disagree. We merely suggested that third-stage proceedings can be distinguished from second-stage proceedings. We did not expressly confront the question whether a different standard applies. Here we do confront that question, and conclude that the same standard applies since the purpose of the third-stage proceeding is also to enforce compliance.

the procedural safeguards of a criminal contempt charge.

380 F.2d at 578–579 (emphasis in original; footnote omitted).[76] We indicated that the third-stage proceeding is neither criminal nor punitive in nature. *Accord, Hoffman v. Beer Drivers & Salesmen's Union Local No. 888*, 536 F.2d 1268, 1273 (9th Cir. 1976). *See also United States v. Work Wear Corp.*, 602 F.2d 110 (6th Cir. 1979); *United States v. Spectro Food Corp.*, 544 F.2d 1175, 1183 (3d Cir. 1976).[77]

Because third-stage proceedings remain civil in character, neither the reasonable doubt standard nor the willfulness requirement are applicable; only the clear and convincing evidence standard should be employed. The Master's decision to impose a more rigorous burden of proof in this case may have had a substantial impact on his findings of fact and conclusions of law. It is quite possible that his decision would not have been in favor of the company if he had not required the NLRB to show that the company had acted in "wilful and deliber-

ate disregard" of the contempt and purgation order and that the company's conduct was wrongful beyond any ground for doubt.[78]

■ For example, as we stated in Part I–D *supra*, the Master found that the NLRB had failed to substantiate its claim that the company had attempted to undermine the union during the period September 1977 to June 1978.[79] If a less rigorous standard of proof had been applied, his conclusion might have changed. The NLRB was able to point to a substantial body of evidence in support of its position. First, the company withheld the annual wage increase in December 1977; moreover, the plant manager told employees that they would have received the increase if it were not for the union's presence. We suggest below that the company may not have been free to withhold the increase. *See* Part II–B *infra*. If it was not, then its action and the plant manager's explanation are

---

**76.** In *Brotherhood*, the amount of the fine that would be assessed in the third stage had been determined at the second stage. Here, on the other hand, the second-stage order says only that $100 will be assessed every day if bargaining did not commence within seven days, and that the NLRB would be able to move for further penalties. *See* text at note 3 *supra*. The $100 per day fine is no longer applicable. Thus the precise nature of the sanction to be applied at the third stage is uncertain. We do not think this difference is sufficient to distinguish the cases, however. What is important is that at the second stage the recalcitrant party was told that unless it complied with the terms of the court's order it would face sanctions.

**77.** The Master also cites a Fifth Circuit case as support for his decision to impose a willfulness requirement. *NLRB v. Laney & Duke Storage Warehouse Co.*, *supra* note 60, 424 F.2d at 113. *See* text at note 60 *supra*. We choose not to follow that case. We note that the Fifth Circuit itself, in a case decided subsequent to *Laney & Duke*, stated, "The absence of wilfulness on the part of the Company's top management cannot relieve the Company from civil contempt. The crucial issue in civil contempt proceedings, as distinguished from criminal contempt, is not the employer's state of mind but simply whether the Court's order was in fact violated." *NLRB v. Crown Laundry & Dry Cleaners, Inc.*, *supra* note 63, 437 F.2d at 293.

In more recent Fifth Circuit cases a willfulness requirement has not been mentioned. *NLRB v. J. P. Stevens & Co.*, 538 F.2d 1152, 1162 (5th Cir. 1976); *NLRB v. Alterman Transport Lines, Inc.*, *supra* note 56, 587 F.2d 212.

**78.** Below we summarize several findings of fact that might have been affected by the Master's failure to apply the proper burden of proof. There also the concurrence suggests that we are engaging in illicit factfinding. *See* conc'g op. at 1191; *see also* note 4 *supra*. Again, we believe that the concurrence misreads our opinion. We merely point out that if the Master had employed the appropriate, less rigorous, burden of proof, many of his factual conclusions might have changed. Because of this possibility, a remand is necessary.

**79.** Of course, an employer who purports to bargain in good faith but who is engaged in efforts to denigrate and undermine the union is not fulfilling its obligations under the federal labor law. *See General Motors Acceptance Corp. v. NLRB*, 476 F.2d 850, 855 (1st Cir. 1973); *Continental Insurance Co. v. NLRB*, 495 F.2d 44, 48, 50 (2d Cir. 1974); *A. H. Belo Corp. v. NLRB*, 411 F.2d 959, 968, 970 (5th Cir. 1969), *cert. denied*, 396 U.S. 1007, 90 S.Ct. 561, 24 L.Ed.2d 498 (1970).

strongly indicative of bad faith.[80] Second, the company repeatedly delayed negotiations, despite the union's objections; its justifications for these delays were often quite flimsy.[81] The company's refusal to accede to union requests for more meetings is not consistent with the spirit of the September 16, 1977 contempt order.[82] Third, the company permitted and may even have encouraged disaffected employees to hold an anti-union meeting on paid company time, even though such meetings were contrary to company policy.[83] Fourth, employees were shown the letter from Brackhahn to McGuire stating that the company would not give in to the union on several key issues. Management may have hoped that the letter would convince employees that further support of the union was futile. Finally, the company attempted to submit a fabricated, less damaging, version of the letter to the NLRB and the Master[84]; certainly, this action is probative on the question of bad faith.

We remand so that the Master may reconsider his decision in light of the proper standard of proof. He need not conduct a new hearing; the correct standard may be applied to the existing record.

**B. Legal Principles to be Applied in Determining Whether Bargaining was in Good Faith**

In addition to our conclusion that the Master imposed an unduly heavy standard of proof on the NLRB, we find that he may not have applied the proper legal principles in determining whether the company bargained in good faith.

**1. Relevance of terms of company's counter-proposals**

Before examining the facts to determine whether the company had bargained in good faith, the Master stated that the evidence must be viewed as a whole, and that the company's intent must be determined from the "totality of circumstances."[85] He also observed that "[i]n general, the obligation to meet and confer in good faith does not compel the parties to agree on a proposal or yield concessions and '[a]damant insistence on a bargaining position ... is not in itself a refusal to bargain in good faith.'"[86] And he stated that "[t]he right to Union representation ... does not imply the right to a better deal."[87]

The Master has not misstated the law: the company was not required to make concessions or to yield any position fairly maintained. However, it was under an obligation to make a sincere, serious effort to adjust differences and to reach an acceptable common ground. See *NLRB v. Insurance Agents' Union*, 361 U.S. 477, 485, 80 S.Ct. 419, 425, 4 L.Ed.2d 454 (1960); *NLRB v. Truitt Manufacturing Co.*, 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956); *Sign & Pictorial Union Local 1175 v. NLRB*, 419 F.2d 726 (D.C.Cir.1969); *A. H. Belo Corp. v. NLRB*, 411 F.2d 959, 969 (5th Cir. 1969), cert. denied, 396 U.S. 1007, 90 S.Ct. 561, 24

---

**80.** See Part II–B infra; see also A. H. Belo Corp. v. NLRB, supra note 79, 411 F.2d at 970 (statements by employer that wage increases were not given because of negotiations with union constitute evidence of bad faith).

**81.** See text and notes at notes 9, 25, 29, 34.

**82.** That order required the parties to engage in consecutive-day bargaining. See text at note 3 supra. It is true that at the outset the parties agreed they would not meet every day. It is also true that the union acquiesced in most of the company's requests for postponements. Nonetheless, we believe that the contempt order imposed some obligation on the company to make a special effort to meet frequently. It is well established, of course, that dilatory tactics constitute evidence of bad faith. A. H.

Belo Corp. v. NLRB, supra note 79, 411 F.2d at 968; International Brhd of Elec. Wkrs v. NLRB, 499 F.2d 542, 543 (D.C.Cir.1974).

**83.** See text and notes at notes 30–31 supra.

**84.** See text and notes at notes 23–24 supra.

**85.** Special Master's Findings of Fact and Conclusions of Law at A 19.

**86.** Id. at 19–20 (quoting Chevron Oil Co. v. NLRB, 442 F.2d 1067, 1072 (5th Cir. 1971)) (brackets and ellipsis in original).

**87.** Id. at 20 (quoting NLRB v. Tomco Communications, Inc., supra note 55, 567 F.2d at 877) (ellipsis in original).

L.Ed.2d 498 (1970). In determining whether the company fulfilled this obligation, the terms of its bargaining proposals may be examined. Rigid adherence to disadvantageous proposals may provide a basis for inferring bad faith. If a company insists on terms that "no 'self-respecting union' could brook," *Vanderbilt Products, Inc. v. NLRB*, 297 F.2d 833 (2d Cir. 1961), it may not be fulfilling its obligation to bargain. *See United Steelworkers of America v. NLRB*, 441 F.2d 1005, 1010 (D.C.Cir.1970), cert. denied sub nom. *Florida Machine & Foundry Co. v. NLRB*, 409 U.S. 846, 93 S.Ct. 50, 34 L.Ed.2d 87 (1971) (insistence upon "a particularly disadvantageous proposal" may be basis for inferring "some degree of bad faith"); *NLRB v. Strauss & Son, Inc.*, 536 F.2d 60, 64 (5th Cir. 1976); *NLRB v. Reed & Prince Manufacturing Co.*, 205 F.2d 131, 134 (1st Cir. 1953).[88]

The Master nowhere explicitly recognized that adherence to a disadvantageous proposal may constitute evidence of bad faith. This principle would seem to be of particular relevance here. As the Master's own findings of fact reveal, the company's contract proposals were quite harsh. The initial proposal would have given the company virtually unilateral control over hiring and discipline of employees, their layoff and recall, and the amount of their compensation. The company also insisted on a no strike/no lockout clause, without the normal *quid pro quo* of binding arbitration.[89] During the course of negotiations the company's position changed only slightly. It did make relatively insignificant concessions on a number of issues. For example, its final wage proposal was somewhat better than the first. However, all wage offers were

limited to named, current employees; the company refused to make an offer keyed to job classifications.[90] Moreover, the company never budged from its position that a seniority system would be unacceptable unless it was based on management's ranking of employees.[91]

We do not mean to hold that the company's proposals could not be justified. The Master does state that the company was in poor financial health and "could afford only a modest wage agreement."[92] He also suggests that the company insisted on a seniority system based on the ability of the worker because it wished to ensure that capable workers would not be laid off during non-peak periods.[93] But these explanations are not fully satisfactory. The fact that the company could afford only a modest wage agreement does not explain why it could not key its wage offer to job classifications.[94] Moreover, the union's final seniority proposal explicitly recognizes management's desire to retain capable workers.[95] The record as it now stands suggests that the Master may not have recognized that unjustified adherence to an unfavorable proposal may constitute evidence of bad faith. Thus, on remand, the Master should give express attention to this possibility in reviewing his conclusions.

## 2. Significance of decision to withhold annual wage increase

The Master rejected the NLRB's claim that the company's decision to withhold the annual wage increase was an act indicative of bad faith. Relying on the Supreme Court's decision in *NLRB v. Katz*, 369 U.S. 736, 746–747, 82 S.Ct. 1107, 1113, 8 L.Ed.2d

---

88. *See also Continental Insurance Co. v. NLRB*, *supra* note 79, 495 F.2d at 48; *NLRB v. Johnson Manufacturing Co. of Lubbock*, 458 F.2d 453, 455–456 (5th Cir. 1972); *A. H. Belo Corp. v. NLRB*, *supra* note 79, 411 F.2d at 968; *Gulf State Canners, Inc.*, 224 NLRB 1566, 1575–1576 (1976).

89. *See* text and note at note 12 *supra*.

90. *See* text and notes at notes 11, 35, 37 *supra*.

91. *See* text at note 42 *supra*.

92. *See* Special Master's Findings of Fact and Conclusions of Law at A 20.

93. *Id.*

94. The argument that it could afford only a modest raise is also undercut by the fact that it granted a substantial pay increase after recognition had been withdrawn from the union. *See* text at notes 47–49 *supra*.

95. *See* text and notes at notes 39–41 *supra*.

230 (1962), he stated that an employer could not unilaterally continue preexisting discretionary wage increases during the course of negotiations. Here, although the wage increases were customarily granted in December, they were based on discretionary merit criteria. Thus he reasoned that the company's decision to withhold the increases until after bargaining had concluded was justified.[96] We are not convinced that the Master correctly applied the principles set forth in *Katz*.

In *Katz* the Supreme Court held that an employer cannot unilaterally change conditions of employment during the course of negotiations with a union; if the company decides to alter a preexisting practice, it must give the union an opportunity to bargain over the change. The Court applied this principle to distinguish between automatic wage increases to which the employer has already committed itself and wage increases that are "in no sense automatic, but [are] informed by a large measure of discretion." 369 U.S. at 746, 82 S.Ct. at 1113. The employer would be required to grant the automatic wage increase unless it notified the union that it wished to make a change in the existing conditions of employment and gave the union an opportunity to bargain over the change. However, the employer could not unilaterally grant a nonautomatic, discretionary wage increase

since "[t]here simply is no way in such a case for a union to know whether or not there has been a substantial departure from past practice * * *." *Id.* Thus the union could "insist that the company negotiate as to the procedures and criteria for determining such increases." *Id.* at 746–747, 82 S.Ct. at 1113.

As the Master stated in his report, the wage increases in question here contained both automatic and discretionary elements. The record strongly suggests that the practice of granting raises every December was an established benefit expected by the employees. However, the increase was not entirely automatic; the amount of the increase apparently depended on an employee's job classification.[97] Under the circumstances, if the company wished to discontinue entirely the practice of granting annual wage increases, it was required to bargain with the union first; *Katz* requires an employer to consult with the union before changing an existing condition of employment. But even if it did not wish to discontinue the practice of granting annual wage increases, it was required to consult with the union. The company could not unilaterally determine the size of the increase that each employee would receive; it would be required to bargain over this discretionary element.[98]

**96.** Special Master's Findings of Fact and Conclusions of Law at A 21.

**97.** *See* Tr. 1104–1106.

**98.** *See General Motors Acceptance Corp. v. NLRB, supra* note 79, 476 F.2d at 854 (reaching similar conclusion where annual wage increase contained both automatic and discretionary elements); *NLRB v. United Aircraft Corp.*, 490 F.2d 1105, 1109–1111 (2d Cir. 1973) (same); *Int'l Union, United Automobile etc. Wkrs v. NLRB*, 455 F.2d 1357, 1365–1366 (D.C.Cir. 1971) (same); *NLRB v. Dothan Eagle, Inc.*, 434 F.2d 93, 98 (5th Cir. 1970) (same). *See also Oneita Knitting Mills, Inc.*, 205 NLRB 500, 500 n.1 (1973):

An employer with a past history of a merit increase program neither may discontinue that program * * * nor * * * any longer continue to unilaterally exercise his discretion with respect to such increases, once an exclusive bargaining agent is selected * * *

What is required is a maintenance of preexisting practices, i.e., the general outline of the program, however the implementation of that program (to the extent that discretion has existed in determining the amounts or timing of the increases), becomes a matter as to which the bargaining agent is entitled to be consulted.

Where the company wishes to continue the practice of granting partly discretionary wage increases, it may do so during the bargaining period without violating the labor laws so long as it is willing to confer with the union if the wages are questioned. In other words, it need not bargain *before* it grants the raise. *See General Motors Acceptance Corp. v. NLRB, supra* note 79, 476 F.2d at 854; *see also H. Fletcher Co.*, 131 NLRB 474 (1961), *enforcement denied on other grounds*, 298 F.2d 594 (1st Cir. 1962); *Southshore Packing Corp.*, 72 NLRB 1116 (1947).

On the basis of the record as it now stands, we cannot determine whether the company fulfilled its obligations under *Katz.* The Master notes in his report that the company informed the union by letter that it would withhold the December wage increases.[99] In fact, the letter stated that the company would not make any wage increases during the bargaining process "that the law prohibits."[100] We do not believe that by making this vague statement the company satisfied its duty to consult with the union. Indeed, the letter is misleading. The law does not prohibit wage increases during bargaining. It simply requires consultation with the union.[101] On remand the Master should reconsider his conclusion that the employer's action was justified. If it was not, then the company's action may be evidence of an attempt to undermine the union, and indicative of bad faith.[102] The Master should direct his attention to the precise nature of the annual wage increase. He should also consider whether the company took any action other than sending the letter that might have fulfilled its obligation to bargain.

### III. CONCLUSION

We remand this case so that the Special Master may apply the proper standard of proof in determining whether the company violated the September 16, 1977 contempt and purgation order. The Special Master should also give special attention to the question whether the company's adherence to disadvantageous proposals supports an inference of bad faith. Finally, he should reconsider his finding that the company properly withheld the December 1977 wage increase. If the Master concludes that his

initial determination was incorrect and decides in favor of the NLRB, he should make recommendations as to appropriate sanctions.

*Remanded to the Special Master with instructions.*

TAMM, Circuit Judge, concurring in the result:

Because I believe that the Special Master apparently applied an erroneous standard of proof, I concur in the result reached by the court.

Examination of the majority opinion, however, leads me to wonder why this court went to the trouble of selecting a Special Master in the first place. The majority opinion embarks upon a lengthy voyage of factfinding unjustified by anything other than philosophical predilection. If the majority desires to engage in such factfinding then it should sit as the Special Master sat, sorting through all of the documents submitted, observing the demeanor of the witnesses, and listening to all of the testimony in the *six days* of hearings that were conducted. Only then would this court's factfinding be of an acceptable level of quality. Until then, however, this factfinding appears as little more than an inspired exercise in legerdemain. *See generally* Nangle, *The Ever Widening Scope of Fact Review in Federal Appellate Courts—Is the "Clearly Erroneous Rule" Being Avoided?,* 59 Wash.U.L.Q. 409 (1981). *See also* Wright, *The Doubtful Omniscience of Appellate Courts,* 41 Minn.L.Rev. 751 (1957).

I list below only a few examples of such sleight of hand in which the majority opinion either seriously questions the Master's

---

**99.** Special Master's Findings of Fact and Conclusions of Law at A 21.

**100.** *See* BX 30 (letter).

**101.** The company could have simply continued its practice of granting annual wage increases in December. So long as it was willing to bargain if the union objected to the raises, it would have fulfilled its obligations under *Katz. See* note 98 *supra.*

**102.** In *NLRB v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), the Supreme Court was concerned with the question whether the decision to withhold or grant a wage increase during the court of bargaining was an unfair labor practice under § 8(a)(5) of the National Labor Relations Act. Elsewhere, however, it has been recognized that a decision to withhold or grant a wage increase may be evidence of bad faith. *See, e. g., General Motors Acceptance Corp. v. NLRB, supra* note 79, 476 F.2d at 855.

findings of fact or *sua sponte* makes its own findings and draws its own inferences— without recognizing the existence of any *standard of review* governing our disposition of this case.

1. Maj. op. at 1177 note 9 and text accompanying: a finding that the Company's proposal had been prepared prior to the negotiating session held on October 10, 1977 and an inference of bad faith.

2. Maj. op. at 1178–1179 notes 22–24, at 1187 note 84 and text accompanying: a finding that the Company submitted a fabricated letter to the NLRB and an inference of bad faith.

3. Maj. op. at 1180 note 35: with reference to Union action at the April 6th meeting, apparent adoption of the NLRB's perspective over an explicit finding to the contrary by the Master. ¶ 15, Appendix at 15.

4. Maj. op. at text accompanying note 81: a finding that the Company's justification for delays "were often quite flimsy." Among the reasons credited by the Special Master in his findings included a family illness, maj. op. at 1178, a snowstorm, *id.* at 1178–1179, the absence of a Company negotiator for business reasons, *id.* at note 25, and the absence of the Federal Mediator, *id.* at 1180–1181. Moreover, the Union agreed to almost *all* of these delays.

The majority has apparently forgotten what this court stated only five years ago: "a court must accept the findings of fact of a master unless 'clearly erroneous.'" *Oil, Chemical & Atomic Workers International Union v. NLRB*, 547 F.2d 575, 580 (D.C.Cir. 1976), *cert. denied*, 431 U.S. 966, 97 S.Ct. 2923, 53 L.Ed.2d 1062 (1977). This proposition has found universal acceptance by the courts in the precise context before us, that of a reference by the court of appeals to a master of a labor relations matter. *E. g., NLRB v. Construction & General Laborers' Union Local 1140*, 577 F.2d 16, 19 (8th Cir. 1978), *cert. denied*, 439 U.S. 1070, 99 S.Ct. 839, 59 L.Ed.2d 35 (1979); *NLRB v. Sequoia District Council of Carpenters*, 568 F.2d 628, 631 (9th Cir. 1977); *NLRB v. J. P. Stevens & Co.*, 563 F.2d 8, 14 (2d Cir. 1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1240, 55 L.Ed.2d 765 (1978); *NLRB v. John Zink Co.*, 551 F.2d 799, 801 (10th Cir. 1977); *NLRB v. J. P. Stevens & Co.*, 538 F.2d 1152, 1160 (5th Cir. 1976). Were we examining an ill-reasoned, arbitrary report, I might perhaps be able to understand the majority's engaging in role substitution. The report submitted by the Special Master is anything but arbitrary, however; instead, it is a thorough, balanced examination of the facts in this case, compiled after six days of hearings and submission of numerous documents and briefs. I can discern no justification, therefore, for the majority's failure to adhere to the principles of review previously adopted by this court.

The majority stumbles even as it moves from its unusual factfinding capacity to its ostensibly more practiced role as expounder of law. In Part II B(1), for example, the majority advises the Master to take note of the principle that bad faith may be inferred from intransigent adherence to disadvantageous proposals. Certainly, examination of the substance of the parties' proposals is not forbidden, and, in certain circumstances, bad faith may be inferred therefrom. *See, e. g., NLRB v. F. Strauss & Son, Inc.*, 536 F.2d 60 (5th Cir. 1976) (withdrawal of offer for three-year contract term and substitution of *nine-day* term). Courts, as well as the Board, must be very careful, however, not to dictate terms to the parties. *United Steelworkers of America v. NLRB*, 441 F.2d 1005 (D.C.Cir.1970), *cert. denied*, 409 U.S. 846, 93 S.Ct. 50, 34 L.Ed.2d 87 (1971). "Adamant insistence on a bargaining position, then, is not in itself a refusal to bargain in good faith." *Chevron Oil Co. v. NLRB*, 442 F.2d 1067, 1072 (5th Cir. 1971). The employer is only obligated to make "*some* reasonable effort in *some* direction" at the bargaining table. *NLRB v. Reed & Prince Manufacturing Co.*, 205 F.2d 131, 135 (1st Cir.), *cert. denied*, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953). As one commentator has noted,

courts have been particularly scrupulous in reviewing Board findings of bad faith when rooted in an examination of the positions espoused by the parties, even

when in the context of other indicia of bad faith . . . [I]n those cases in which the Board has based a finding of bad faith upon the employer's substantive position at the bargaining table, the employer is insisting upon a set of terms which would place the employees and the union in a worse (or no better) economic position than had there been no contract at all . . . Moreover, this is usually accompanied by a refusal to offer serious and specific reasons for the employer's position or by an admission . . . that certain requests of significance for the union could be granted at no additional cost to the employer.

Gorman, Labor Law 489 (1976). On the basis of this standard, the Master should examine all of the circumstances, not merely the terms of the parties' proposals. He must then make a second and independent decision on whether the Board has met its burden of presenting clear and convincing evidence that the Company has in fact violated this court's order by failing to make "*some* reasonable effort in *some* direction at the bargaining table." *NLRB v. Reed & Prince Manufacturing Co.*, 205 F.2d at 135.[1]

The majority opinion also questions the Master's conclusion that the Company's failure to continue the granting of discretionary merit wage increases while holding negotiations with the Union complied with *NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). The majority's focus in this discussion is unhelpful, however, until its conclusion. At that point, the majority opinion admits that the crucial question is whether the Company's action was "an attempt to undermine the union, and indicative of bad faith." Maj. op. at 1190. As *the cases relied upon by the majority* make clear, bad faith cannot be presumed from a failure to comply with *Katz. General Motors Acceptance Corporation v. NLRB*, 476 F.2d 850, 854 (1st Cir. 1973); *NLRB v. United Aircraft Corp.*, 490 F.2d 1105, 1111 (2d Cir. 1973) (the company failed to "pro-

duce evidence that fear of violating the law by granting the increase was the actual motive for withholding it."). Thus, should the Master once again come to the factual conclusion that the "Company decided to withhold the December 1977 raises under the belief that it was barred from granting such discretionary merit increases while the bargaining was in process," ¶ 9, Appendix at 10, this court could not conclude that this decision constituted evidence of bad faith unless it found such a factual finding clearly erroneous.

The application of an improper standard of proof by the Special Master requires this court to reverse and remand for the Master's reevaluation. It does not require, however, either an intrusion into the Master's factfinding functions or an attempt to indicate in no uncertain terms the "proper" result to be reached upon remand. Respect for this court as an institution should, however, preclude the Special Master from believing that the court has today exercised its power in a demand that the Master reverse himself.

Therefore, although I fail to see any justification for the court's order that the Master make new findings of fact, it has so ordered. The Master may well want to hold further hearings. I urge the Special Master, however, to exercise his independent judgment and to reach a result in harmony with the law as well as the facts, the latter of which, at the least, this court is clearly less familiar with than is the Special Master.

---

1. Furthermore, although I realize that "each case is unique and generalization hazardous," Gorman, Labor Law 489 (1976), the Master should take due cognizance of *NLRB v. Crock-* *ett-Bradley, Inc.*, 598 F.2d 971 (5th Cir. 1979), a case that resembles the one before us in a number of respects.