**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**WORK WEAR CORPORATION,
Defendant-Appellant.**

Nos. 77–3140, 78–3482.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 8, 1979.

Decided June 28, 1979.

Harry C. Nester, Albert I. Borowitz, Hahn, Loeser, Freedheim, Dean & Wellman, Stephen J. Knerly, Bennet Kleinman, Kahn, Kleinman, Yanowitz & Arnson, Cleveland, Ohio, John D. Swartz, Pollak, Swartz, Stark & Amron, New York City, for defendant-appellant.

Robert M. Dixon, Joan Farragher Sullivan, Dept. of Justice, Antitrust Division, Frederick M. Coleman, U.S. Atty., Cleveland, Ohio, Griffin B. Bell, Atty. Gen. of United States, Robert B. Nicholson, Daniel J. Conway, Barry Grossman, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before EDWARDS, Chief Judge, and CELEBREZZE and KEITH, Circuit Judges.

KEITH, Circuit Judge.

This case presents the question whether the district court * abused its discretion in refusing to reduce by half a civil contempt fine of over $1 million. Since we are unable to find an abuse of discretion on the record before us, we affirm.

## I.

In June of 1968, the Anti-Trust division of the Justice Department filed suit against defendant Work Wear Corporation, alleging that defendant's acquisition of a number of industrial laundries violated section 7 of the Clayton Act, 15 U.S.C. § 18. After extensive negotiations, the parties agreed upon a consent settlement of the case. This consent decree was approved by the district court and entered on September 27, 1971.

Under the terms of the consent decree, Work Wear had the choice of divesting either: (1) each of the affiliated manufacturing facilities listed in Exhibit A of the decree or (2) each of the affiliated industrial laundries listed in Exhibit B of the decree. On May 23, 1973, Work Wear filed with the district court its intention to divest and 11 industrial laundries listed in Exhibit

* The Honorable Robert B. Krupansky.

B.[1] It contemplated either individual sale of the 11 laundries, or wholesale disposition of all of its approximately thirty domestic industrial laundries via "spin-off"[2] "split-off"[3] or sale of assets. By this date, Work Wear had already sold three of the 11 laundries; in the fall of 1973 the company sold another.

Disposing of the remaining eight[4] laundries proved troublesome. By letter dated July 8, 1974, Work Wear informed the government of its desire to "spin-off" all of its domestic industrial laundries. Since the three-year divestiture deadline of September 22, 1974 was fast approaching, Work Wear requested an extension of time. The government was agreeable and stipulated to an extension of time to June 30, 1975, for Work Wear to comply with the Consent Judgment.

Work Wear failed in its efforts to obtain Internal Revenue Service approval of the proposed spin-off's tax-exempt status, however, and, on April 28, 1975, informed the government that the spin-off plan was no longer feasible. As an alternative, Work Wear proposed to modify the consent decree to require that only three of the eight remaining laundries be divested. The government refused to acquiesce in any modification of the decree and, on July 1, 1975, filed a Petition For An Order To Show Cause Why Work Wear Should Not Be Found In Civil Contempt. Work Wear countered with its partial divestiture proposal. In the alternative, the Company urged that no contempt sanctions were warranted since it had at all times acted in good faith. Specifically, the company argued that selling a service business was difficult in the first place since most of such a business' assets are goodwill and that only a purchaser involved in the laundry business would risk buying it. Work Wear urged that these difficulties were compounded by then-existing economic conditions and problems associated with securing approval for the sales from the Justice Department's anti-trust division.

After a full hearing on the matter, the district court on August 15, 1975, found 1) that Work Wear was in "technical" contempt of court for its failure to divest, 2) that Work Wear had acted in good faith, and had been stymied by circumstances beyond its control[5] and 3) that Work Wear's

1. These laundries were:
   Arrow Uniform Service
   Philadelphia, Pennsylvania

   Blue Grass Uniform Supply Company
   Owensboro, Kentucky

   Dixie Uniform and Linen Supply
   Tampa, Florida

   Industrial Uniform and Towel Service, Inc.
   Tyler, Texas

   Mechanics Laundry Company
   Detroit, Michigan

   Mechanics Laundry Supply, Inc.
   Indianapolis, Indiana

   Progressive Uniform Service, Inc.
   Detroit, Michigan

   Dixie Uniform Supply
   Jacksonville, Florida

   Red Star Industrial Service
   Fresno, California

   Rental Uniform Service
   New Orleans, Louisiana

   Star Uniform Rental
   Brooklyn, New York

   In addition, Work Wear was committed to divest another Laundry, Mechanic Uniform Rental, Inc. of Newark, New Jersey. After extensive wrangling, the Justice Department in January of 1973 had agreed to permit Work Wear to acquire Mechanic in order to consolidate it with the unprofitable Star Rental Co. of Brooklyn, New York and fashion an attractive enterprise for prospective purchasers. Work Wear, of course incurred an obligation to divest itself of Mechanic as well.

2. See 26 U.S.C. § 355.

3. See id.

4. The seven remaining laundries listed in Schedule B of the Consent Decree, plus the subsequently-acquired Mechanics, Inc. of Newark, New Jersey. See fn. 1.

5. In relevant part, the court found:
   Work Wear's sincere efforts to timely accomplish complete divestiture are not open to dispute. Since the date of Final Judgment herein, Work Wear has expended approximately $400,000 for the services of public accountants Price Waterhouse & Co., investment bankers Kuhn, Loeb & Co., corporate counsel Hahn, Loeser, Freedheim, Dean &

proposed modification of the consent decree was unwarranted.[6] The court refused to impose contempt sanctions and gave Work Wear an additional 16 months to comply with the decree—until December 31, 1976. At the same time, the court warned that failure to divest by that date would result in Work Wear's being found in contempt of court and a fine payable at the rate of $5,000 per day until divestiture took place.

Work Wear persisted in its efforts to divest all of its domestic industrial laundries via a spin-off. A formal spin-off plan was submitted to the government on April 23, 1976, but the Anti-Trust division objected because it did not think that the new company would be sufficiently independent. When the Internal Revenue Service declined to give a favorable tax ruling, Work Wear went back to the drawing board. A new proposed spin-off plan followed, but the Internal Revenue Service proved to be recalcitrant and the plan, as amended to meet IRS objections, could not be implemented by the December 31, 1976, deadline.

On December 29, 1976, two days before the deadline, Work Wear once again asked for an extension of time. It represented that it was on the verge of divestiture and requested that it be given until March 31,

1977, to divest. Alternatively, Work Wear suggested that the threatened $5,000 per day fine be imposed, subject to forgiveness if divestiture took place by March 31, 1977. The government opposed this request and countered by seeking civil contempt sanctions. The matter was brought before a hearing on January 14, 1977.

By Memorandum Opinion and Order of January 19, 1977, the district court, tired of Work Wear's procrastination,[7] imposed the $5,000 per day contempt fine, effective January 1, 1977. This fine was in accord with the judge's order of August 15, 1975, where he had warned that no additional extensions would be granted.[8]

Work Wear appealed to this court, advancing a host of reasons why the district court had abused its discretion when it imposed contempt sanctions. In the meanwhile, Work Wear proceeded with its spin-off plan. Although S.E.C. and I.R.S. approval was forthcoming, problems developed with the anti-trust division over a potential conflict of interest which the government feared would perpetuate a substantial and anti-competitive relationship between Work Wear and its "divested" laundries.[9] After much wrangling, the conflict of interest problem was resolved[10] and

Wellman, and antitrust counsel Pollack, Schwartz, Stark & Amron to comply with this Court's Order.

In short, Work Wear's efforts to divest in designated laundry facilities have been frustrated by failure of the spin-off plan, and strained economic conditions commencing in early 1974 resulting in a prolonged recessionary period and escalating interest rates causing a pronounced absence of ready buyers for its laundry outlets.

6. The Court found no radical change in circumstances or extreme hardship which would warrant changing the consent decree. *See United States v. Swift & Co.*, 286 U.S. 106, 119, 52 S.Ct. 460, 76 L.Ed. 999 (1932).

7. The Court stated:
The history of these protracted proceedings is replete with pleadings and actions on the part of defendant which have delayed and forestalled the inevitable divestiture required by the Clayton Act and the Orders of this Court.

8. In addition, on December 15, 1976, while ruling on a peripheral matter, the Court had re-

minded the parties that the December 31, 1976, divestiture deadline was fast-approaching and no further extension would be granted.

This arose when one of Work Wear's creditors, concerned over possible adverse effects which divestiture would have on the corporation, had requested leave to participate as an *amicus curiae*. The district court denied the request.

9. Under the plan, the Kirshbaum brothers, one of the two major Work Wear shareholder groups, would retain a 24% interest in Work Wear and at the same time serve as Senior Executives in the split-off company. Since the brothers would manage the divested laundries, the government feared that they would purchase work clothes for the laundries from Work Wear.

10. The parties agreed upon specified limits on the amount of work clothes which the split-off company could purchase from Work Wear. This agreement was incorporated into the Stipulation and Order which was signed by the district court on June 22, 1977.

the government approved the spin-off. On June 17, 1977, all involved parties signed a Stipulation and Order embodying the divestiture agreement. The district court approved it on June 22, 1977. Divestiture was finally accomplished on July 26, 1977. However, since 207 days had passed between January 1, 1977, and July 26, 1977, when divestiture was finally completed, Work Wear's contempt fine had accumulated to $1,035,000.

After divestiture took place and while its appeal of the imposition of the contempt fine was pending before this Court, Work Wear approached the government regarding the possibility of reducing the fine.[11] After extensive negotiations, the parties reached an agreement. The government would not oppose a F.R.Civ.Pro. 60(b)(6) motion seeking reduction of the fine by one-half, plus $5,000 attorney's fees. In return, Work Wear agreed that in the event the district court refused to reduce the fine, it would limit any appeal of that decision to challenging only that portion of the fine exceeding $517,000 plus $5,000 attorney's fees. This Court granted a limited remand to the district court to allow presentation of the Rule 60(b)(6) motion.

After a hearing, the district court denied the relief requested in an opinion which concluded with the following words:

> To accede to the joint request of the parties to retroactively diminish the fine imposed to an arbitrary amount of one-half the total amount accrued, without just cause or a showing of mitigating circumstances, would denigrate the authority of the Court and sanction mere lip service to its Orders. The action of the Government attorneys in attempting to stipulate the reduction of the fine is a

presumption upon the jurisdiction and authority of the Court and an interference with its power of contempt.[12]

Work Wear has appealed from the district court's denial of relief, claiming that it was an abuse of discretion to refuse to reduce the fine. In accord with its stipulation, Work Wear has abandoned its contention that the district judge abused his discretion in imposing the fine in the first place. Thus, the sole issue before, us is whether the court erred in failing to grant Work Wear's Rule 60(b)(6) motion.

## II.

We have outlined the facts of this protracted case in some detail in order to give a flavor to the difficulties faced by the parties and the district court. This case is over 10 years old. It took Work Wear over 27 months after the three years contemplated in the consent decree to accomplish divestiture. It is established law that modification of a judgment pursuant to Rule 60(b) is extraordinary relief which requires the showing of special circumstances. *Ackerman v. United States,* 340 U.S. 193, 202, 71 S.Ct. 209, 95 L.Ed. 207 (1950); *Silvers v. TTC Industries, Inc.,* 395 F.Supp. 1318, 1321 (E.D.Tenn.1974), *aff'd.* 513 F.2d 632 (6th Cir. 1975). On appeal, we can reverse the failure to grant a Rule 60 motion only on a showing of abuse of discretion. *Villareal v. Braswell Motor Freight Lines, Inc.,* 545 F.2d 978, 979 (5th Cir. 1977); *Douglass v. Pugh,* 287 F.2d 500, 501 (6th Cir. 1961).

Work Wear seeks to make this showing by arguing that the district court applied an erroneous standard of law, that the district court failed to give sufficient weight to the recommendation of the anti-trust division and that the district court failed to give

---

11. The district court had suspended execution upon the fine pending a decision by this Court on the propriety of the Contempt Order.

12. Earlier in its opinion, the Court had stated: That the government, which had so insistently urged compliance with the Court's Order, so persistently pursued the coercive force of the Court's contempt authority, and so emphatically demanded the levy and payment of the $5,000 per day fine, would now come

before this Court and voice its request that the fine be reduced, *nunc pro tunc,* is beyond comprehension. That either party would presume that the Orders of this Court and the penalties imposed for contumacious conduct may be unilaterally set aside by the mere stipulation of the parties is an invasion upon and unwarranted interference with the authority of the Court.

sufficient weight to the public interest served by the stipulation.

Work Wear's first argument is that the district court confused civil and criminal contempt and improperly rested its decision on the need to vindicate its authority.[13] As the above quoted passages from the district court's opinion indicate, there is no doubt that the court was concerned over perceived intrusions upon its authority. The court's exasperation with the government's conduct in first pressing for contempt sanctions and then recommending a reduction in the contempt fine is also evident. However, a reading of the district court's order reveals that it did consider the full record and found no mitigating circumstances which would warrant reducing the fine. Thus, there is no basis for concluding that the denial of the motion was premised on an erroneous legal standard.

In any event, it was not error for the court to consider the need to vindicate its authority. Criminal contempt exemplified by a fixed fine or sentence has as its principle purpose the vindication of judicial authority. *See Gompers v. Bucks Stove and Range Co.,* 221 U.S. 418, 441, 31 S.Ct. 492, 55 L.Ed. 346 (1911). Civil contempt is meant to be remedial and to benefit the complainant either by coercing the defendant to comply with the Court's order via a conditional fine or sentence or by compensating the complainant for any injury caused by the defendant's disobedience. *See Gompers, supra* at 441–443, 31 S.Ct. 492. Nonetheless, it is clear that there is no bright line dividing civil and criminal contempt. Vindication of judicial authority is present in both. *See Juidice v. Vail,* 430 U.S. 327, 335–36 and n. 12, 97 S.Ct. 1211, and n. 12, 51 L.Ed.2d 376 (1977); *Shillitani v. United States,* 384 U.S. 364, 369–371, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); *Gompers*

*v. Bucks Stove, supra,* 221 U.S. at 443, 31 S.Ct. 492. In the words of the Second Circuit, "[t]he civil nature of the contempt is not turned criminal by the court's efforts at vindicating its authority, an interest which may be implicated in either civil or criminal proceedings." *United States v. Wendy,* 575 F.2d 1025, 1029 n. 13 (2d Cir. 1978). This is particularly true here, where the contempt sanction imposed was a coercive daily fine, designed to secure compliance with and respect for the court's order. *See Latrobe Steel Co. v. United States Steelworkers,* 545 F.2d 1336, 1344 (3d Cir. 1976); *id.* at 1350 (Garth, J. concurring); *Brotherhood of Locomotive Fire and Engine v. Bangor and Aroostock Ry Co.,* 127 U.S.App. D.C. 23, 36, 380 F.2d 570, 583 *cert. denied,* 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 461 (1967).

Defendant's remaining arguments deal with whether the facts of this case show that an abuse of discretion took place. Principally, Work Wear argues that the district court failed to give sufficient weight to the anti-trust division's recommendation, especially since the division continually monitored Work Wear's compliance efforts. We think that this misstates the division's position. The Justice Department never retreated from its position that a coercive fine was needed to jar Work Wear out of its cavalier attitude toward the consent decree's requirement that divestiture take place. As part of a litigation compromise, the Department was willing to recommend that the fine be cut in half to the still-substantial amount of $517,000, in the hope of terminating the litigation while still retaining a viable precedent for the future.

The district court was as familiar as the Department with Work Wear's compliance efforts inasmuch as both sides present-

---

13. In some cases, the distinction between civil and criminal contempt has not been clear, *see,* e. g. *United States v. United Mineworkers,* 330 U.S. 258, 303–04, 67 S.Ct. 677, 91 L.Ed. 884 (1947); *Gompers v. Bucks Stove and Range Co.,* 221 U.S. 418, 441, 31 S.Ct. 492, 55 L.Ed. 797 (1911). Here however, there is no dispute that the contempt sanction imposed was civil, specifically a coercive fine. *See also United States v. Mitchell,* 556 F.2d 371, 382–85 (6th Cir.), *cert. denied,* 434 U.S. 925, 98 S.Ct. 406, 54 L.Ed.2d 284 (1977); *I.B.M. v. United States,* 493 F.2d 112, 114–17. (2d Cir. 1973), *cert. denied,* 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974).

ed a clear record of what had transpired; a record which is also before us on appeal. The record reveals that most of Work Wear's difficulties were caused by its understandable desire to divest on favorable financial terms. There is nothing wrong with this. Indeed the district court recognized Work Wear's financial difficulties when it granted an extension of time in August of 1975. However, mere financial hardship is no excuse for failure to comply with a lawful court order. *See United States v. du Pont and Co.*, 366 U.S. 316, 326–31, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1961). The record fairly reveals that Work Wear placed its own financial considerations ahead of complying with the law.

■ As the district court noted, Work Wear's diligence is seeking divestiture in early 1977 is explainable by the coercive fine. Unexplained is the lack of equal diligence prior to that time, during the extension period. Further, divestiture delays which occurred during early 1977 are largely explainable by Work Wear's insistence on the divestiture's being tax-free. There is much truth in the government's assertion

that the accumulation of the civil fine was in large part due to a conscious business decision by Work Wear not to divest unless it could retain its favorable tax ruling.[14] Under these circumstances, the district court could have reasonably concluded that reduction of the fine was not in order.

In light of the intimate familiarity which the district court had with these drawn-out proceedings, and its patient granting of an initial extension of time for compliance, the court's failure to grant the rule 60(b) relief should be accorded particular deference.[15] It would require a strong showing for us to say that the district court abused its discretion by failing to reduce the fine. Work Wear has failed to make this showing.

■ If Work Wear's Rule 60(b) motion was before us *de novo* we very well may have acted favorably on it. However, we cannot say on examination of this record that the district court abused its discretion in denying the relief sought.[16]

The judgment of the district court is affirmed.

---

14. Work Wear also maintains that the $5,000 per day fine was improperly calculated because it was based on a fallacious assumption concerning the daily profits of the laundries to be divested. As the Supreme Court noted in *United Mine Workers, supra*, 330 U.S. at 303–04, 67 S.Ct. 677, the magnitude of the coercive sanction to be imposed requires a weighing of the harm caused by noncompliance "and the probable effectiveness of any suggested sanction in bringing about the result desired." *Id.* at 304, 67 S.Ct. at 701. Although there is some evidence in the record to the contrary, the district court asserted that it "carefully considered" the magnitude of the fine in January of 1977. We cannot say that the fine was improperly calculated. *See United States v. Papercraft Corp.*, 540 F.2d 131, 141 (3d Cir. 1976); *I.B.M. v. United States*, 493 F.2d 112, 116–17 (2d Cir. 1973), *cert. denied*, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974).

As is noted above, Work Wear itself proposed that the $5,000 per day fine be suspended and/or forgiven if divestiture was accomplished by March 31, 1977. Divestiture did not in fact take place until July of 1977 and Work Wear did not challenge the amount of the fine until it filed its first appeal from the imposition of contempt sanctions.

15. In other contexts, the Supreme Court has accorded special deference to determinations

by trial judges with long experience with a troublesome case. *See Hutto v. Finney*, 437 U.S. 678, 688, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (Arkansas prison system litigation); *United States v. Montgomery Board of Education*, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969) (Alabama school desegregation litigation). *Cf. National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (Where record showed extreme patience by District Court, in allowing a party time to comply with discovery orders, no abuse of discretion for judge to invoke severe sanction of dismissal upon a finding of willful noncompliance.)

16. While we see no abuse of discretion on these facts, we see no basis for the district court's terming of the government's fine-reduction recommendation as presumptuous. It was clear from the beginning that the government was merely making a a non-binding recommendation. The government made the reasonable judgment that a civil fine of $517,000 would be adequate and that the public interest would be served by a speedy termination of the litigation. The district court was free to reject the recommendation, as it did, but the government's conduct was both proper and commendable.