**Willie L. CLARK, Jr., Regional Director of the Eleventh Region of the National Labor Relations Board, Plaintiff,**

v.

**INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA, Defendant.**

**Civ. A. No. 89–0090–A.**

United States District Court, W.D. Virginia, Abingdon Division.

Dec. 7, 1990.

---

George Carson, II, Winston–Salem, N.C., for N.L.R.B.

Karl Kindig, Lebanon, Va., for Clinchfield Coal Co.

Morgan E. Scott, Jr., Ray B. Fitzgerald, Jr., Roanoke, Va., for U.S.

William Shults, Washington, D.C., James J. Vergara, Jr., Hopewell, Va., Michael Passino, Nashville, Tenn., for International Union, United Mine Workers of America.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, Senior District Judge.

This matter is before the court on the motion of the International Union, United Mine Workers of America ("the Union") for the dismissal of fines the court imposed as civil sanctions for contempt. The motion is unopposed by the plaintiff, the National Labor Relations Board ("the Board"). The court will deny the motion.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 5, 1989, the Union began a strike against the Pittston Coal Group ("Pittston"). Clinchfield Coal Company ("Clinchfield") is a subsidiary of Pittston. The strike followed months of unsuccessful contract negotiations between the Union and Pittston.

The Union's members immediately began to engage in mass picketing and the blocking of ingress and egress to various Pittston operations. One tactic the Union used called for miners to sit down in both public and private roadways so as to block the movement of trucks used to haul coal from mines to railheads.

Soon after the strike began, Richard Trumka, the President of the Union, endorsed the use of nonviolent civil disobedience before a large Union assembly at the county fairgrounds in Wise County, Virginia. Jesse Jackson also appeared before this gathering and repeated the call for civil disobedience. The Union obviously sought to engender the same emotions in

people as those created in the public by the civil rights movement of the 1950s and 1960s.

Picketing and blocking roads were not the only tactics the Union used, however. It is fair to say that the Union has a history of using violent tactics during strikes, and old habits did not die simply because some called publicly for nonviolent civil disobedience. During the early months of the strike "jackrocks" were repeatedly found on the roads at the same locations as the Union pickets.[1] Gunfire destroyed a transformer at one of Pittston's mines. Coal trucks operated by non-Union drivers survived repeated attacks by rock throwers. Union members followed nonstriking Pittston employees as they traveled to and from work; some of these employees reported that Union members had threatened them. Thus, despite the Union's alleged commitment to nonviolent civil disobedience, the coalfields of Southwest Virginia actually were infused with a tense atmosphere of menace and violence.

The Circuit Court of Russell County, Virginia sought to use its injunctive powers to reduce the level of tension in the area. Unfortunately, the Union's members violated the injunction and continued their illegal activities even though the state court repeatedly levied large fines against the Union for contempt in violating the injunction. Despite the obvious best efforts of the state court, the Union continued to defy the rule of law.

On May 16, 1989, the Board filed with this court a petition for injunction under § 10(j) of the National Labor Relations Act. Except that there was no allegation of gunfire, the Board's petition alleged conduct by the Union quite similar to that already described above. The court issued a temporary restraining order ("TRO") against the Union on May 24, 1989. As the court explained in chambers prior to entering the TRO,

> this order ... directs the Union to tell each of its members [who] is out here picketing exactly what the effect of this order is. It forbids mass picketing and physically blocking the ingress and egress of the sites of the Clinchfield Coal Company, inflicting and attempting to inflict damage to the property of the employer and non-striking employees. And it goes on ... to talk about stopping or attempting to obstruct, hinder or prevent any employees or any other persons doing business with Clinchfield Coal Company from going to and from the place of employment or from working.

Transcript of Hearing dated May 24, 1989, p. 22. The TRO also required the Union to give in writing "clear and precise instructions, orders and directions" to its members to refrain from the conduct described in the TRO, and it required the Union to "[t]ake reasonable steps to see that" its members complied with the TRO. It can be seen, then, that the court's order served two purposes: it required affirmative action from the Union to inform and direct its members, and it required the Union's members to refrain from certain conduct.

On June 1, 1989, the court conducted a preliminary injunction hearing. After hearing from both the Union and the Board, the court extended the TRO until June 7, 1989 so that the court could determine whether or not further injunctive relief was needed.[2] Having decided that a

---

1. A "jackrock" is composed of two large nails welded together in such a fashion that a sharp point is always pointed upward when the device is thrown upon the ground.

2. In what is best described as "Phase I" of the strike, the Union primarily relied on the already-mentioned tactic of Union members/supporters sitting or lying in front of coal trucks. Thus, also on June 1, the court *sua sponte* ordered that some 300 persons show cause why they should not be held in contempt of court for violating the TRO by using the "sitdown" tactic. On June 5, the first of these contempt hearings commenced with Union agents Marty Hudson, Cecil A. Phillips, and Jackie Stump appearing before the court. Though the evidence of their contemptuous conduct was overwhelming, *see* Transcript of Hearing dated June 5, 1989, *passim*, not one of the agents offered to purge his contempt. The court then committed the three to jail. In sending them to jail, the court stated to one (Phillips) that it sought "to obtain compliance with [its] order," June 5 Transcript, p. 25, and to another (Stump) that it wished to see "how you're going to go about it of seeing that [the

preliminary injunction was needed, the court issued a "temporary injunction" ("TI") on June 7, 1989.[3] Like the TRO, the TI not only announced prohibited conduct but also required affirmative action from the Union.

On June 21, 1989, the court entered an order directing the Union and two of its agents, John Cox and Cecil Roberts, to appear and show cause why they should not be held in contempt for violation of the injunction.[4] After a hearing on June 23, the court on June 26, 1989 issued a Memorandum Opinion and Order. The June 26 ruling found the Union and its agents in contempt of court for violations of the TI on June 21 and 22. The court fined the Union $100,000 for each day's violation, for a total of $200,000. The court fined Cox and Roberts $10,000 each for each day's

violation, for a total of $20,000 against each agent. At this point, the total of fines assessed against the Union and its agents was $240,000.

The court also announced prospective fines against the Union of "$100,000 per day every day ... that [the Union's] members and/or supporters impede traffic to and from the Clinchfield Coal Company operations in violation of the order of the court." Against Cox and Roberts, the court announced prospective fines of $10,000 for each day "that the roads to Clinchfield Coal's properties are impeded or blocked in violation of this court's order."

The court continued the matter of the June 21 show cause order to July 5, 1989. On that day, after another hearing, the court issued two orders. In one order, the court stated its findings that the violations

court's] order is carried out...." *Id.* at 28. On June 20, 1989, the three Union agents appeared before the court and stated that they would not "intentionally and knowingly violate" the court's order or "ask others to do so." The court ended their confinement on the same day.

During June 1989, the court held four more contempt hearings. Approximately 316 persons appeared and agreed not to violate the court's order in the future. The court did not impose punishment on any person and made it clear at all of these hearings that its only goal was securing compliance with the court's order. Transcript of Hearing dated June 13, 1989, pp. 19, 65; Transcript of Hearing dated June 19, 1989, pp. 10, 15; Transcript of Hearing dated June 19, 1989, p. 11; Transcript of Hearing dated June 21, 1989, p. 9.

**3.** *See Clark v. International Union, United Mine Workers of America,* 714 F.Supp. 791 (W.D.Va. 1989) for the court's reasoning as to why the TI was "just and proper."

**4.** After Hudson, Phillips, and Stump pledged not to disobey the court's order, the Union apparently directed Roberts, its vice-president, to take control of the strike in Southwest Virginia. At about this time, miners from outside this area came here for their summer vacations. And, perhaps in response to Union president Trumka's June 11 statement that the Union was on strike against the state of Virginia, Transcript of Hearing dated June 23, 1989, pp. 56–57, many miners from other states engaged in wildcat strikes and traveled to this area.

Since most of these vacationers/strikers had cars, the Union began what is best described as "Phase II" of the strike: "slowdowns." Union members/supporters formed long, extremely slowmoving automobile convoys. These con-

voys effectively halted the ingress and egress of coal trucks and other company vehicles at Pittston's Moss Number 3 main processing plant, as well as drastically slowed the ability of Pittston employees to drive from place to place. The convoys also interrupted normal commerce, and violence against a non-striking truck driver and his truck occurred at least once. June 23 Transcript, *passim.*

At the June 23 hearing on the court's show cause order, the court heard extensive evidence of how the convoys were blocking the roads around the main processing plant, to include the day before the hearing. *Id.* The court also heard evidence of the acquiescence to and sometimes active support of the convoys by Union agents Cox and Roberts. *Id.* at pp. 8–9, 61–63, 66, and 68–71. At 12:20 p.m. on June 23, the court called a recess and announced that it would fly over the convoy area. When the court flew over the area at approximately 1:00 p.m., only the customary coal trucks were visible. The court considered this strong evidence of the Union's control over its members. *Id.* at pp. 68–71; Memorandum Opinion dated June 26, 1989. At a later hearing, the court learned that the Union's control was so precise that convoys occurred on June 23 both before and after the court's aerial inspection of the processing plant and surrounding roads. Transcript of Hearing dated July 5, 1989, pp. 33–37. The convoys also resumed in the days following the June 23 hearing. July 5 Transcript, *passim.*

Because of the continued contemptuous conduct by Union members, the court began trying dozens of criminal contempt cases against individual Union members/supporters in the days and months following the June 23 hearing. However, the court never initiated criminal contempt proceedings against the Union itself.

of the TI which the court found on June 26 (relating to June 21 and 22) had continued unabated on June 23, 26, 27, 28, 29 and 30, and that in addition to obstructing traffic, the members of the Union were engaging in acts of violence. Concluding that the Union and its agents continued to be in contempt of court, the court imposed against the Union a fine of $800,000, or $100,000 for each day the Union had been in contempt of court. (This fine included the $200,000 from the June 26 hearing.) Similarly, the court imposed a fine of $80,-000 each against Cox and Roberts, for a total of $160,000. (Again, this fine included the June 26 fines of $20,000 each against Cox and Roberts.) At this point, the total amount of fines levied against the Union and its agents was $960,000.[5]

Significantly, following the levy of the $960,000 in fines on July 5, the court directed that the fines would be deemed a final judgment, payable to the United States of America. The court also directed that execution would issue on these fines and that the United States Attorney should proceed to collect them.

The Union responded to the fines by posting a bond for the amount of the fines. The court approved this bond on July 11, 1989. On the day the court approved the bond, the Union noted an appeal of the July 5 Order. On July 13, the Union filed a motion with the court seeking an alteration or amendment of the court's orders imposing fines for contempt. The court addressed this motion on February 14, 1990.[6]

On February 12, 1990, the Board and the Union made a joint motion to dismiss the case. The parties informed the court that the Union and Pittston had settled and compromised all their claims and litigation against each other, including the unfair labor practice charges that gave rise to this case. The Union submitted a proposed decree, which the Board did not oppose, providing for the dismissal of all fines and the dissolution of the injunction on the satisfaction of certain conditions.

The court entered two orders on February 14, 1990. In the first order, the court responded to the motion to alter or amend. The court concluded that half of the outstanding fines were improperly imposed. The reasoning for this decision was as follows: The court's fines addressed eight specific days of contemptuous conduct by the Union: June 21, 22, 23, 26, 27, 28, 29 and 30. Because the court had not announced a coercive fine schedule *until* June 26, it had imposed the fines for June 21, 22, 23, and 26 without allowing the Union and its agents an opportunity to avoid the contempt that the court found by its Orders of June 26 and July 5, 1989. Consequently, the fines were reduced from a total of $960,000 to $480,000, with the reduction to be effective *nunc pro tunc* to October 27, 1989.

In the second order, the court responded to the motion to dismiss by setting forth its conditions for the dismissal of the case. The conditions were (a) that the Union membership ratify the contract and cease all strike activity; (b) that the Fourth Circuit Court of Appeals approve a proposed addendum to one of the court's prior orders; (c) that the remaining fines of Cox and Roberts ($40,000 each) and $120,000 of the Union's fines would be eliminated if Cox, Roberts, and the Union purged themselves of contempt and performed 10,000 hours of community service; (d) that the Union pay the remaining $280,000 to the court, which would then pay that amount to the United States Marshals Service; and

---

5. In the other Order, the court increased the prospective fines against the Union to $500,000 per day and against Cox and Roberts to $50,000 per day.

6. In the interim, the court received a Motion for Order to Show Cause on September 18 and entered coercive orders on September 20 and 21 pertaining to the Union's seizure of a coal preparation plant. The court received a Petition for Adjudication in Civil Contempt on October 18, and held hearings on October 27 and November 8. These hearings disclosed considerable evidence of acts of contempt by the Union committed after June 30. Nevertheless, the court elected not to impose further fines against the Union. Finally, the court agreed to stay all matters pertaining to the strike for a one-month period beginning January 10, 1990, for the negotiations between the Union and Pittston had begun to culminate in settlement.

(e) that the Union's members would comply with the court's previous orders.

On August 7, 1990, the court entered an order detailing its findings as to the conditions for dismissal announced in the second order dated February 14, 1990. The court found that all the conditions for dismissal had been met except for the payment of $280,000 to the court. In response to the Union's assertion that the remaining fines should be vacated, the court directed the Union to submit a brief in support of its assertion.

The Union filed a formal motion to vacate the fines and an accompanying brief on September 6, 1990. The Board, while continuing to assert that it did not oppose what the Union sought, filed a brief in response to the Union's motion on October 16, 1990. The Union, with the leave of the court, filed a reply to the Board's brief on October 23, 1990.

The issue now before the court concerns only the Union. Specifically, the issue is whether the court should vacate the fine of $280,000, which is what remains of the $400,000 the court assessed against the Union for its activities on June 27, 28, 29, and 30, 1989.

### ANALYSIS

The Union advances two arguments why it should not be held responsible for its contempt toward this court. The Union argues that the fines the court levied against it were criminal in nature. If this is so, the fines must be vacated because the court did not afford the Union the constitutional protections due a criminal defendant. Because of the settlement of the underlying dispute out of which the Union's contempt grew, the Union also argues that the contempt fines levied against it are moot. Neither of the Union's arguments challenges the merits of the court's determination that the Union was in contempt. Instead, both arguments are best described as procedural.

### I. THE FINES ARE NOT CRIMINAL

The Union presents two arguments for the proposition that the fines are criminal in nature. First, the Union argues that the fines are punitive, rather than coercive or compensatory. Second, the Union argues that the fines are criminal as a matter of law because the court itself initiated the contempt proceedings. These arguments will be dealt with in turn.

### A. *Punitive or Coercive?*

■ As an initial matter, it should be noted that the court denominated as "civil" the proceeding in which it imposed these fines for contempt. Transcript of Hearing dated July 5, 1989, p. 74. However, the court is aware that "[a] district court's description of a contempt sanction as either civil or criminal is not determinative...." *Buffington v. Baltimore County, Maryland*, 913 F.2d 113, 133 (4th Cir.1990) (citing *Shillitani v. United States*, 384 U.S. 364, 369, 86 S.Ct. 1531, 1534, 16 L.Ed.2d 622 (1966)). Instead, in determining whether the relief imposed in a contempt proceeding is properly classified as civil or criminal, "the critical features are the substance of the proceeding and the character of the relief that the proceeding will afford." *Hicks v. Feiock*, 485 U.S. 624, 631, 108 S.Ct. 1423, 1429, 99 L.Ed.2d 721 (1988). (Though *Hicks* arose from a state court's contempt proceedings, the Union cites it as applying here and the court sees no reason for it not to apply.)

The Union argues that the court's injunction was prohibitory as opposed to mandatory. From this assertion, the Union argues that fines levied for violation of a prohibitory injunction must be criminal. For this proposition the Union points to *Hicks*, which quotes *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 443, 31 S.Ct. 492, 499, 55 L.Ed. 797 (1911), as follows:

> The distinction between refusing to do an act commanded,—remedied by imprisonment until the party performs the required act; and doing an act forbidden,—punished by imprisonment for a definite term; is sound in principle, and generally, if not universally, affords a test by which to determine the character of the punishment.

*Hicks*, 485 U.S. at 632, 108 S.Ct. at 1430. *Hicks* notes that a contempt fine imposed to punish a contemnor is criminal in nature, *id.* at 631, 108 S.Ct. at 1429 (citing *Gompers*, 221 U.S. at 441, 31 S.Ct. at 498), while a contempt fine imposed for failure to perform a mandatory act carries an important escape mechanism for the contemnor: " 'One who is fined, unless by a day certain he [does the act ordered] has it in his power to avoid any penalty.' " *Id.*, 485 U.S. at 633, 108 S.Ct. at 1430 (bracketed material in original) (quoting *Penfield Co. v. S.E.C.*, 330 U.S. 585, 590, 67 S.Ct. 918, 921, 91 L.Ed. 1117 (1947)).

■ It is immaterial whether the Union is correct in noting that fines imposed for violation of a prohibitory injunction are criminal in nature.[7] The Union only conclusorily asserts that the court's injunction was prohibitory: "[T]hey [the fines] involve the commission of prohibited acts, not the failure to take mandated action. They cannot be described as coercive." Actually, as the discussion that follows will show, the fines clearly served a coercive end: the TI, the fine schedule, and ultimately the fines themselves all sought to coerce the Union into performing a mandatory act. Thus, the Union's exposition of the law regarding contempt fines and prohibitory injunctions has little effect here, for the Union has simply failed to support its assertion that the injunction and fine schedule were prohibitory and not mandatory.

Though the TI superseded the TRO, it is important first to study the language of the TRO, for it gives a good example of the affirmative action the court sought from the Union throughout the strike. As noted earlier, the TRO required the Union to provide in writing to virtually any person connected with the Union "instructions, orders and directions" to refrain from certain strike activity that included the blocking of ingress and egress to Clinchfield's properties. The TRO also required the Union to

> [t]ake reasonable steps to see that the aforementioned instructions, orders, and directions are enforced and complied with by their members, officers, representatives, agents, servants, employees and all persons acting in concert or participation with them.

Thus, it is clear that the TRO not only announced prohibited acts, but also placed affirmative duties on the Union.

The TI retained almost verbatim the description of prohibited acts announced in the TRO. The language requiring affirmative action from the Union was similar but not the same as that in the TRO. The TI required the Union to give a copy of the Order to each Union member and to give each member "a clear written directive to specifically refrain from engaging in any of the conduct described in [the prohibited acts section of the TI] or any similar conduct."

The court's Opinion dated June 26, 1989 described at length the court's conclusion that the Union leadership had "absolute and total control" over the Union's members. The court then threatened *the Union* with a fine of "$100,000 per day every day ... that [the Union's] members and/or supporters impede[d] traffic to and from the Clinchfield Coal Company operations *in violation of the order of the court* " (emphasis added). Since the TI ordered the Union to give written directions to its members to refrain from the conduct described in the prohibited acts section "or any sim-

---

7. Though it is not necessary for the decision announced in the main text (since the court feels that the Union faced a mandatory injunction), the court briefly notes that fines assessed under a prospective fine schedule issued in an effort to halt prohibited conduct certainly appear to fall within the Supreme Court's definition of civil contempt fines. *Hicks*, 485 U.S. at 633, 108 S.Ct. at 1430. Under this rationale, the court has already vacated half of the fines imposed because they were not prospective in nature. It is also clear that "the substance of [such a prospective fine schedule] and the char-

acter of the relief that [such a prospective fine schedule would] afford" strongly indicate that fines assessed under such a schedule would be civil, and not criminal. *Id.* at 631, 108 S.Ct. at 1429.

Interestingly, the Board does not challenge the Union's conclusory assertion that the injunction here is prohibitory rather than mandatory. However, the Board parallels the court in disagreeing with the Union that contempt fines levied for violations of prohibitory injunctions are always criminal in nature.

ilar conduct," it is clear now and it was clear then that the TI and the fine schedule together required the Union to act affirmatively so that the Union's members would obey the injunction. In other words, the TI and the fine schedule required the Union affirmatively to use its great persuasive power over its members so that ingress and egress to the Clinchfield properties could resume.[8] *Cf.* Transcript of Hearing Dated June 23, 1989, pp. 62–63 (In response to questioning by the court, Union vice-president Roberts said he doubted that he had the power to stop Union members from blocking roads, but in any event, indicated that he had not tried and would not try to stop members from blocking roads.). Thus the court made it clear that the fines were imposed prospectively and could be avoided by Union compliance with the Order.

At the hearing on July 5, 1989, the court found that the Union had not taken the mandatory action the TI and fine schedule required and imposed the fines at issue here. The Union's argument that these fines were "fixed and determinate" and thus punitive is misleading. By complying with the court's orders, the Union could have avoided the imposition of any fines, just as a natural person could avoid coercive imprisonment by complying with a court order. *Penfield,* 330 U.S. at 590, 67 S.Ct. at 921. However, the Union did not comply.

As it noted at the July 5 hearing, the court could not place the Union in jail in order to coerce the Union. Transcript of Hearing dated July 5, 1989, p. 74. Thus, the court fined the Union. The imposition of fines was analogous to jail time, and the purpose of the fines was to coerce the Union into obeying the TI and fine schedule. Simply because the court resorted to fines of a definite amount (the only coercive measure it had against the Union) did not render the fines "fixed and determi-

nate" so as to be criminal in nature. To hold otherwise would mean that no unincorporated association could ever be fined for civil contempt. *See N.L.R.B. v. Blevins Popcorn Co.,* 659 F.2d 1173, 1185 (D.C.Cir. 1981) ("To hold that the third-stage ... [of a three-stage contempt proceeding] is punitive or criminal would be to hold that a court may never bring about compliance with its orders by imposing prospective penalties in civil proceedings."); *United States v. Work Wear Corp.,* 602 F.2d 110, 115 (6th Cir.1979) (Court ruled that " 'civil nature of contempt' " remains even though "contempt sanction imposed was a coercive daily fine, designed to secure compliance with and respect for the court's order.").

Based on the analysis and conclusions described above, the court rejects this ground of the Union's argument that the fines are criminal in nature.

B. *The Court's Sua Sponte Motion*

The court on its own motion issued the show cause order that led to the imposition of the fines at issue here. Because of this fact, the Union asserts that as a matter of law the contempt proceedings were criminal and not civil. For this proposition the Union cites, *inter alia, Young v. United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987).

*Young* does come close (by negative implication) to suggesting that a court-initiated contempt proceeding must always be considered criminal in nature. *Id.,* 481 U.S. at 801, 107 S.Ct. at 2134 ("[A] court has the authority to initiate a prosecution for criminal contempt...."). However, the assumption upon which *Young* is founded is that a court initiating contempt proceedings is always solely concerned with vindicating its own authority. *Id.* at 800, 107 S.Ct. at 2134 (Court-initiated contempt proceedings "are designed to serve the limited purpose of vindicating the authority of the court.").

---

8. An important case that supports the court's view is *United States v. United Mine Workers of America,* 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947) (*"Mine Workers* I"). In that case, the same Union that is the defendant here was found, among other things, to have "permitted [a strike notice] to remain outstanding...."

*Mine Workers* I, 330 U.S. at 269, 67 S.Ct. at 684. The Supreme Court expressly upheld civil contempt sanctions against the Union: "Judicial sanctions in civil contempt proceedings may, in a proper case, be employed ... to coerce the defendant into compliance with the court's order.... *Id.* at 303, 67 S.Ct. at 701.

As the following analysis shows, this assumption is not correct in all cases.

In *S.E.C. v. American Bd. of Trade, Inc.*, 830 F.2d 431 (2d Cir.1987), *cert. denied*, 485 U.S. 938, 108 S.Ct. 1118, 99 L.Ed.2d 278 (1988), the Second Circuit reviewed a case involving an unregistered commercial paper program that had been found unlawful. The Court noted that the district court's injunction "was designed to protect persons who were not parties to the action and [who] were too numerous and too ill-informed to protect their own interests." *Id.* at 441. Ruling that "the circumstances of th[e] case" justified the district court's sua sponte resort to *civil* contempt proceedings when faced with a violation of its injunction, the Court held that

> the district court had the obligation and the resultant power to protect [the defendant's] noteholders, the principal beneficiaries of the underlying proceeding, whether or not the SEC specifically requested such relief.

*Id.* The Second Circuit also described as "critical" the fact that the district court's plan was "carefully tailored" to be coercive and not punitive. *Id.* at 441–42.[9]

*American Bd. of Trade* thus demonstrates an important and necessary exception to the Union's assertion that court-initiated contempt proceedings must always be criminal in nature. Moreover, the court feels that the facts here are quite similar to those that led the Second Circuit to rule as it did.

In this case, the court had the unpleasant experience of witnessing on television each night undisputed evidence of the violation of the TI. Despite local and national newspaper and television coverage of the strike, the Board made no effort to seek contempt action against the Union. Thus, the court

was forced to take action or be subject to ridicule by the public for doing nothing to carry out the TI. Later, Mr. Clark, Regional Director, NLRB, appeared in court and blamed Pittston for not furnishing information. Yet, the Board could have obtained the same information the court obtained by asking the Virginia State Police for their evidence.

Facing continued inactivity by the Board, the court could not ignore the visual and print reports of contemptuous Union conduct. It would be disingenuous for the court to assert that thoughts of vindicating the court's authority never entered the court's mind. However, *Hicks* points out that civil contempt has a "vindication" aspect. *Id.*, 485 U.S. at 635–36, 108 S.Ct. at 1431–32 (citing *Gompers*). Moreover, the court felt an obligation to all citizens, not just those parties to this suit, to take some action to alleviate the tense atmosphere that existed in Southwest Virginia. Most importantly, the coercive fine schedule, the fact that the court vacated some previously-imposed fines, and the fact that the court refrained from imposing further fines in the face of continued contemptuous conduct by the Union, n. 6, *supra*, all show that the court's overriding goal throughout the contempt proceedings was to coerce the Union into complying with the terms of the injunction, *not* to punish the Union.

■ The court finds that its actions fall within the exception described in *American Bd. of Trade*. First, since the court was faced with a tense atmosphere of menace and violence that impacted on all citizens in Southwest Virginia, the circumstances justified the court's sua sponte motion. Second, it is obvious from the measured steps the court took after initiating

---

**9.** The Second Circuit also pointed out that, by the time of the appeal, the S.E.C. agreed with the district court's action. *Id.* at 442. Here, the N.L.R.B. does not oppose the Union's motion to vacate the contempt fines. Nevertheless, the court does not believe the disparity is important on the issue of whether the court's fines are civil.

The court resorted to contempt proceedings precisely because the N.L.R.B. failed to move for a show cause order, just as the district court

in *American Bd. of Trade* did when the S.E.C. failed to initiate contempt proceedings. As pointed out in the main text, the crucial factors that indicate the civil nature of the contempt proceedings are the circumstances facing the court and the coercive, rather than punitive, nature of the court's order. Thus, since the N.L.R.B.'s inaction made it necessary for the court to act in the first place, no reason supports the notion that the N.L.R.B. subsequently must "second" the court's action.

contempt proceedings that the court's overriding goal was to coerce the Union into complying with the terms of the injunction.

Based on the analysis and conclusions described above, the court holds that its resort to contempt proceedings on its own motion did not make those proceedings criminal in nature.

## II. THE FINES ARE NOT MOOT

■ The Union cites *Gompers* for the proposition that civil contempt fines do not survive the settlement of the dispute out of which the fines arise:

> When the main case was settled, every proceeding which was dependent on it, or a part of it, was also necessarily settled, —of course, without prejudice to the power and right of the court to punish for contempt by proper proceedings.

*Id.*, 221 U.S. at 451, 31 S.Ct. at 502. The Union then cites *United States v. International Union, United Mine Workers of America,* 190 F.2d 865 (D.C.Cir.1951) ("*Mine Workers II*") and *Flight Eng'rs Int'l Ass'n v. Eastern Air Lines, Inc.,* 301 F.2d 756 (5th Cir.1962) as later cases that apply the rule announced in *Gompers.* After reviewing these cases, the court finds that they do not apply to the facts here.

In *Gompers,* the Supreme Court had before it an appeal of contempt sanctions by three union representatives. Before the Supreme Court ruled on the alleged contemnors' appeal, it learned that the underlying dispute between the representatives and the company had settled. In its opinion, the Supreme Court first held that the district court's sanctions were criminal in nature. Then, in the language quoted above, the Court set forth the rule the Union relies on today. However, as this short exposition of the facts shows, the *Gompers* rule only holds that where a court imposes *criminal* sanctions followed by settlement of the underlying dispute, no remand for *civil* contempt proceedings may take place in connection with the case. The *Gompers* Court did not have before it (as the court here does) civil contempt fines that were imposed in a completed proceeding prior to settlement of the underlying dispute.

Factual differences similar to those in *Gompers* also exist in *Flight Eng'rs* and *Mine Workers* II. In *Flight Eng'rs,* the court did not impose contempt sanctions until after the settlement of the underlying dispute. *See id.,* 301 F.2d at 757–58. In *Mine Workers* II, the United States was appealing a district court's refusal to impose civil contempt sanctions on the same Union that is the defendant here. *Id.,* 190 F.2d at 866. During the pendency of the appeal, the dispute settled. The District of Columbia Court of Appeals relied on the fact of the settlement to dismiss the government's appeal as moot. *Id.* at 877. Thus, as in *Gompers* and *Flight Eng'rs,* the court in *Mine Workers* II was not confronted by civil contempt fines imposed in a completed proceeding prior to settlement of the underlying dispute.

In arguing against the Union's assertion of mootness, the Board cites, *inter alia,* two cases: *Work Wear* and *Brotherhood of Loc. Firemen & Enginemen v. Bangor & Aroostook R.R. Co.,* 380 F.2d 570 (D.C. Cir.), *cert. denied,* 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 461 (1967). The Union points out that neither case expressly mentions the doctrine of mootness, and from this fact argues that neither case should apply here. However, the court feels that *Work Wear* is quite similar to the facts here, and that the implications in both cases do much to undermine the Union's mootness argument.

In *Work Wear,* an antitrust case, the district court placed a coercive fine on a corporation for each day that the corporation failed to divest itself of certain subsidiaries. *After* the required divestiture, the corporation sought, and the government did not oppose, a reduction by half of slightly over $1 million in contempt fines levied against the corporation. The district court refused to reduce the fines, and the corporation appealed.

The Sixth Circuit's analysis primarily refuted the contemnor's argument that the fines were criminal in nature. *See* Part IA, *supra.* However, it is also clear that the

Court knew divestiture had occurred. *Id.,* 602 F.2d at 114 ("Divestiture was finally accomplished on July 26, 1977."). Further, the Court cited *Gompers* while discussing the civil/criminal distinction, *id.* at 115, raising the implication that the Court was aware of *Gompers* teachings regarding the mootness issue. Despite the fact that there was no affirmative act to coerce *at the time of the Court's decision,* the Sixth Circuit upheld the district court's refusal to reduce the contempt fines. Thus, *Work Wear's* obvious implication is that cessation of the contemptuous act does not moot the obligation to pay coercive contempt fines imposed before the end of the contemptuous conduct.

In *Brotherhood of Loc. Firemen,* the district court imposed a contempt fine on the union in order to compel compliance with an order of the court. Before the union's appeal reached the District of Columbia Circuit, the Court was aware that the union's members had returned to work. *Id.,* 380 F.2d at 578. Nevertheless, the Court held that,

> [c]ertainly, the characteristic of a coercive civil contempt action is not abandoned when, although both the adjudication of contempt and imposition of the fine are coercively prospective, the final assessment of such coercively imposed fines does not occur prior to the termination of the contemptuous act.

*Id.* at 578–79. Though the facts in *Brotherhood of Loc. Firemen* were not the same as exist here (since this court assessed the fines against the Union well before the contemptuous acts terminated), the clear implication from *Brotherhood of Loc. Firemen* nevertheless applies here: The end of the contemptuous conduct does not moot one's liability for coercive contempt fines imposed before the termination of the contemptuous acts.

Both *Work Wear* and *Brotherhood of Loc. Firemen* argue against accepting the Union's mootness argument. The court also feels that it is merely logical to deny that the fines here are moot: a natural person placed in jail for failing to perform a mandatory act "may carry the keys of

[his] prison in [his] own pocket[ ]." *Hicks,* 485 U.S. at 633, 108 S.Ct. at 1430 (quoting *Penfield Co.,* 330 U.S. at 590, 67 S.Ct. at 921). Nevertheless, the time that person has spent in jail *until* performance of the mandatory act is irretrievable. Similarly, the Union *could* have avoided all of the fines at issue here; once the court imposed the fines, however, they were analogous to the jail time a natural person serves until performing the mandatory act. In the court's view, reason dictates that the fines against the Union are irretrievable.

Finally, the court's adoption of the Union's mootness argument would absolutely undermine the efficacy of civil contempt sanctions. If the Union's argument governed, any organization facing coercive contempt fines would know that it only had to postpone actual collection of the fines until the settlement of the underlying dispute to avoid payment of the fines altogether. No decision of this court will allow such unanswered contempt toward the rule of law.

## CONCLUSION

In *Mine Workers* I, the Supreme Court noted that

> [t]he gains, social and economic, which the miners and other citizens have realized in the past are ultimately due to the fact that they enjoy the rights of free men under our system of government. Upon the maintenance of that system depends all future progress to which they may justly aspire. In our complex society, there is a great variety of limited loyalties, but the overriding loyalty of all is to our country and to the institutions under which a particular interest may be pursued.

*Id.,* 330 U.S. at 306, 67 S.Ct. at 702. During the pendency of the strike, the Union and its members, for whatever reason, failed to demonstrate that "overriding loyalty" which ensures the triumph of the rule of law over the whims of man. This refusal to recognize the right and power of the court is especially marked since prior to, during, and after the strike Union members appeared before this court seeking the pro-

tection of the law in matters unrelated to the strike. The average citizen ponders why he pays his fines but the Union is excused; why he is required to obey the law and the Union is not.

With this motion to vacate the contempt fines, the Union attempts an anarchic tour de force. During the strike, the Union ignored the court's efforts to coerce it into compliance with the injunction. Now the Union seeks to have the fines the court imposed for its noncompliance vacated. If these fines are not upheld, the Union acknowledges that the court may resort to criminal proceedings to punish the Union for criminal contempt. However, since the court cannot send the Union, an incorporeal entity, to jail, the strongest punishment *this court* could impose upon the Union for criminal contempt is a $10,000 fine. *Blanton v. City of N. Las Vegas, Nev.*, 489 U.S. 538, 541, 109 S.Ct. 1289, 1291, 103 L.Ed.2d 550 (1989); 18 U.S.C.A. § 19 (West Supp. 1990); 18 U.S.C.A. § 3571 (Unannotated Text) (West Supp.Pamphlet 1989). If this court's inherent power of coercion to enforce its orders by civil contempt is inhibited as the Union seeks under the facts of this case, and if the Union can by simple averment that the strike is over avoid the consequences of its disobedience as is sought here, then the Union's tour de force will be complete: it will be above the law in Southwest Virginia.

Based on the facts, analyses, and conclusions described above, the court denies the Union's motion to vacate the fines levied against it for violation of the court's Order. The court will enter an appropriate Order.